IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____
                                                              )
PRIMESOURCE BUILDING PRODUCTS, INC.,  )
                                                              )
              Plaintiff,                                 )
                                                              )
        and                                               )
                                                              )
CHENG CH INTERNATIONAL CO., LTD.,       )
CHINA STAPLE ENTERPRISE CORPORATION,)
DE FASTENERS INC., HOYI PLUS CO., LTD.,   )
LIANG CHYUAN INDUSTRIAL CO., LTD.,       )
TRIM INTERNATIONAL INC., UJL                  )
INDUSTRIES CO., LTD., YU CHI HARDWARE  )
CO., LTD., and ZON MON CO., LTD.,             )          Consol. Court No. 20-03911
                                                              )
              Consolidated Plaintiffs,            )
                                                              )
        v.                                                  )
                                                              )
UNITED STATES,                                      )
                                                              )
              Defendant,                               )
                                                              )
        and                                               )
                                                              )
MID-CONTNENT STEEL & WIRE INC.,          )
                                                              )
              Defendant-Intervenor.             )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL:
VANIA WANG
Attorney
Department of Commerce
Office of the Chief Counsel
  for Trade Enforcement & Compliance

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7568

August 16, 2021

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2(c)(1) ................................................................... 2

    I.    Administrative Determination Under Review ...................................................... 2

    II.    Issue Presented For Review ................................................................................. 2

STATEMENT OF FACTS ................................................................................................... 2

SUMMARY OF THE ARGUMENT .................................................................................... 5

ARGUMENT ....................................................................................................................... 6

    I.    Standard Of Review ............................................................................................ 6

    II.    Commerce's Use Of The Expected Method Was Lawful And Supported By Substantial Evidence ........................................................................................... 8

        A.    Relevant Legal Framework .................................................................. 8

        B.    Commerce's Use Of The Expected Method Was Lawful ...................... 10

        C.    Substantial Evidence Does Not Support A Finding That The Dumping Of The Non-Selected Respondents Differed From The Dumping Of The Mandatory Respondents ....................................................................... 14

        D.    Commerce Reasonably Determined To Use The Expected Method Instead Of Pulling Forward A Rate .................................................................... 20

CONCLUSION ................................................................................................................... 23

# TABLE OF AUTHORTIES

**CASES**                                                                    **PAGE(S)**

*Albemarle Corp. & Subsidiaries v. United States,*
   821 F.3d 1345 (Fed. Cir. 2016)......................................................................passim

*Am. Silicon Techs. v. United States,*
   261 F.3d 1371 (Fed. Cir. 2001).............................................................................17

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984)............................................................................... 7

*Bosun Tools Co. v. United States,*
   463 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ........................................... 14, 15, 20

*Bosun Tools Co., Ltd. v. United States,*
   493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ........................................... 15, 19, 21

*Changzhou Hawd Flooring Co. v. United States,*
   848 F.3d 1006 (Fed. Cir. 2017) ................................................................9, 10, 12

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States,*
   701 F.3d 1367 (Fed. Cir. 2012)........................................................................11, 12

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ............................................................................................7, 9

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ............................................................................................... 6

*Downhole Pipe & Equip., L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015)............................................................................17

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996)............................................................................6, 8

*GODACO Seafood Joint Stock Co. v. United States,*
   494 F. Supp. 3d 1294 (Ct. Int'l Trade 2021) .......................................................18

*Guangdong Wireking Housewares & Hardware Co. v. United States,*
   745 F.3d 1194 (Fed. Cir. 2014)............................................................................22

*INS v. Elias-Zacarias*,
  502 U.S. 478 (1992) ........................................................................... 7

*Itochu Bldg. Prods. v. United States*,
  733 F.3d 1140 (Fed. Cir. 2013) ......................................................13

*JBF RAK LLC v. United States*,
  790 F.3d 1358 (Fed. Cir. 2015) ........................................................ 8

*Navneet Publ'ns (India) Ltd. v. United States*,
  999 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...............................11, 18

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ........................................................ 7

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009) ........................................................ 6

*Pro-Team Coil Nail Enterprise v. United States*,
  Consol. Ct. No. 18-00027, Slip Op. 21-93 (Ct. Int'l Trade July 30, 2021) ............................11

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998) ........................................................13

*Shandong Huarong Gen. Corp. v. United States*,
  159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) .................................... 7

*Shandong Huarong Mach. Co. v. United States*,
  29 C.I.T. 484 (2005) ........................................................................20

*Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*,
  279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ..................................13

*Timken Co. v. United States*,
  354 F.3d 1334 (Fed. Cir. 2004) ........................................................ 7

*U.S. Steel Grp. v. United States*,
  96 F.3d 1352 (Fed. Cir. 1996) ........................................................ 8

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ..................................................................6, 7, 8

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) .........................................................................14, 18

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ........................................................................................ 6
19 U.S.C. § 1673d(c)(5)(B) ...................................................................................13, 14
19 U.S.C. § 1673(c)(5)(B) .................................................................................9, 11, 14
19 U.S.C. § 1673d(c)(5) .............................................................................................10
19 U.S.C. § 1673d(c)(5)(A) ........................................................................................ 8
19 U.S.C. § 1677f-1(c)(2) ........................................................................................... 9
19 U.S.C. § 1677f-1(c)(2)(B) .................................................................................16, 19
19 U.S.C. § 1677m(a) ...........................................................................................13, 19
Pub. L. No. 114-27 ....................................................................................................12

## REGULATIONS

19 C.F.R. § 351.301(c) ...............................................................................................17
19 C.F.R. § 351.204(d) ...............................................................................................13

## OTHER AUTHORITIES

*Aluminum Extrusions from the People's Republic of China*,
    82 Fed. Reg. 57,951 (Dep't of Commerce Dec. 8, 2017) .....................................23

*Drawn Stainless Steel Sinks from the People's Republic of China*,
    83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018)...................................20

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*,
    83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) ...........................20

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018) ...................................21

*Diamond Sawblades and Parts Thereof From the People's Republic of China*,
    83 Fed. Reg. 17,527 (Dep't of Commerce Apr. 20, 2018) ....................................21

*Refillable Stainless Steel Kegs from the People's Republic of China*,
    84 Fed. Reg. 25,745 (June 4, 2019) .....................................................................21

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019)..................................... 2

*Refillable Stainless Steel Kegs From the People's Republic of China*,
    84 Fed. Reg. 57,010 (Dep't of Commerce Oct. 24, 2019) ....................................21

*Certain Steel Nails From Taiwan*,
   85 Fed. Reg. 19,138 (Dep't of Commerce April 6, 2020) ...................................................4, 5

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   85 Fed. Reg. 42,353 (Dep't of Commerce July 14, 2020) .....................................................22

*Certain Steel Nails From Taiwan,*
   85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020)...................................................2, 5

*Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*,
   86 Fed. Reg. 6,866 (Dep't of Commerce Jan. 25, 2021) ......................................................22

*Passenger Vehicle and Light Truck Tires From the People's Republic of China*,
   86 Fed. Reg. 21,275 (Dep't of Commerce Apr. 22, 2021)....................................................23

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, at 873 (1994) as reprinted in 1994 U.S.C.C.A.N. 4040 ...................9, 22

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____

|  |  |
|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| CHENG CH INTERNATIONAL CO., LTD., ) | |
| CHINA STAPLE ENTERPRISE CORPORATION,) | |
| DE FASTENERS INC., HOYI PLUS CO., LTD., ) | |
| LIANG CHYUAN INDUSTRIAL CO., LTD., ) | |
| TRIM INTERNATIONAL INC., UJL ) | |
| INDUSTRIES CO., LTD., YU CHI HARDWARE ) | |
| CO., LTD., and ZON MON CO., LTD., ) | Consol. Court No. 20-03911 |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| MID-CONTNENT STEEL & WIRE INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |

_____)

## ORDER

Upon consideration of the motions for judgment upon the administrative record filed by plaintiffs, responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.


_____

CHIEF JUDGE

Dated: _____

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
_____

|  |  |  |
|---|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHENG CH INTERNATIONAL CO., LTD., | ) | |
| CHINA STAPLE ENTERPRISE CORPORATION, | ) | |
| DE FASTENERS INC., HOYI PLUS CO., LTD., | ) | |
| LIANG CHYUAN INDUSTRIAL CO., LTD., | ) | |
| TRIM INTERNATIONAL INC., UJL | ) | |
| INDUSTRIES CO., LTD., YU CHI HARDWARE | ) | |
| CO., LTD., and ZON MON CO., LTD., | ) | Consol. Court No. 20-03911 |
| | ) | |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MID-CONTNENT STEEL & WIRE INC., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| _____) | | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motions for judgment upon the agency record filed by

plaintiff, PrimeSource Building Products Inc. (PrimeSource), and consolidated plaintiffs, Cheng

Ch International Co., Ltd., China Staple Enterprise Corporation, De Fasteners Inc., Hoyi Plus

Co., Ltd., Liang Chyuan Industrial Co., Ltd. (LC), Trim International Inc., UJL Industries Co., Ltd., Yu Chi Hardware Co., Ltd., and Zon Mon Co., Ltd. (collectively, plaintiffs).   Plaintiffs challenge a single issue from the Department of Commerce's (Commerce) final results of the fourth administrative review of the antidumping duty order covering certain steel nails from Taiwan.   Because the final results are supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court reject plaintiffs' challenge, sustain the final results, and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.  Administrative Determination Under Review

Plaintiff's challenge *Certain Steel Nails From Taiwan,* 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) (final results of antidumping administrative review), P.R. 92, and accompanying Issues and Decision Memorandum (IDM), P.R. 90.  The period of review covered by the final results is July 1, 2018 through June 30, 2019.  *Id.*

### II.  Issue Presented For Review

Whether Commerce's calculation of the non-selected rate for non-selected respondents (that is, the all-others rate) is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

On September 9, 2019, Commerce initiated the fourth administrative review of its antidumping duty order covering nails from Taiwan.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't of Commerce Sept. 9, 2019) (initiation notice), P.R. 6.  Commerce selected Bonuts Hardware Logistics Co., LLC (Bonuts) and Create Trading Co., Ltd. (Create), the two companies accounting for the largest

volume of subject merchandise from Taiwan during the period of review, as mandatory respondents for individual examination. Respondent Selection Memorandum (October 22, 2019), P.R. 29, C.R. 5.

On October 23, 2019, Commerce issued its antidumping questionnaire to Bonuts, and on October 28, 2019, its questionnaire to Create. Bonuts Questionnaire (Oct. 23, 2019), P.R. 30; Create Questionnaire (Oct. 28, 2019), P.R. 32. Bonuts did not respond to the questionnaire. Create submitted a letter along with evidence explaining that it had no sales because of Commerce's reseller policy. Create No Sales Submission (Nov. 12, 2019), P.R. 35, C.R. 6; IDM at 9. Based upon Create's submission, Commerce did not require Create to respond to the questionnaire. Commerce Letter to Create (Jan. 13, 2020), P.R. 45. Commerce then conducted an additional respondent selection process, selecting Pro-Team Coil Nail Enterprise Inc. (Pro-Team), the next largest exporter in terms of volume. Additional Respondent Selection Memorandum (Jan. 17, 2020), P.R. 46; IDM at 9. Pro-Team submitted a letter to Commerce stating that it would not be responding to the antidumping questionnaire. Pro-Team Letter (Jan. 31, 2020), P.R. 51; IDM at 9.

On February 3, 2020, LC, a non-individually examined (*i.e.*, non-selected) exporter of subject merchandise during the period of review, submitted respondent selection comments to Commerce. LC Selection Comments (Feb. 3, 2020), P.R. 52. LC requested that Commerce "calculate the rate for LC using data from LC." *Id*. at 2. In the alternative, LC asked that Commerce "use the rate from the 2017-2018 administrative review for LC, or use the all-others rate from the original less than fair value investigation of certain steel nails from Taiwan." *Id*. at 2-3. Mid Continent Steel & Wire Inc. (Mid Continent) opposed LC's request, arguing that it was untimely and that LC had failed to follow the statutory and regulatory requirements to be a

voluntary respondent; Mid Continent also cited the lack of time to develop the record for a new respondent. Mid Continent Response to LC (Feb. 5, 2020), P.R. 53.

On April 6, 2019, Commerce published its preliminary results. *See Certain Steel Nails From Taiwan*, 85 Fed. Reg. 19,138 (Dep't of Commerce April 6, 2020) (preliminary results), P.R. 57, and accompanying decision memorandum (PDM), P.R. 55. Commerce preliminarily applied total adverse facts available (AFA) to both Bonuts and PT because of their failures to respond to Commerce's questionnaire. PDM at 7-9. Commerce also found that LC's willingness to submit questionnaire responses constituted insufficient grounds for it to be chosen a mandatory respondent, as it was not the next largest exporter of subject merchandise, and that willingness was not a consideration pursuant to the statutory scheme unless the company had fulfilled all the statutory and regulatory criteria for consideration. PDM at 3-4. As Commerce found, LC did not follow the statutory and regulatory criteria for consideration as a voluntary respondent. *Id.* Commerce also addressed LC's alternative request to pull its rate from the previous review forward, and explained that it could not do so because Commerce was legally required to follow the expected method, and pulling forward the rate was "not a feasible or legally sanctioned methodology for assigning review-specific rates to non-individually examined respondents." PDM at 4.

Turning to the rate for non-selected companies, Commerce, relying on the Court of Appeals for the Federal Circuit's decision in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016), applied the expected method to calculate the rate for non-selected respondents by averaging the AFA-based rates for Pro-Team and Bonuts, which in this situation was the same rate assigned to those mandatory respondents. PDM at 10. Commerce

4

thus preliminarily assigned antidumping rates of 78.17 percent for Bonuts, Pro-Team, and the non-selected respondents. Preliminary Results, 85 Fed. Reg at 19,139.

After considering the interested parties' letters and case briefs, Commerce issued its final results on November 27, 2020. *See* Final Results, 85 Fed. Reg. at 76,014. Commerce continued to employ the expected method in calculating the all-others rate, explaining in great detail why the expected method was lawful, as well as appropriate, considering the history of rates assigned in previous segments of the proceeding. IDM at 9-20. Commerce continued to assign an antidumping duty rate of 78.17 percent for Bonuts, Pro-Team, and the non-selected respondents. Final Results, 85 Fed. Reg. at 76,015.

## SUMMARY OF THE ARGUMENT

Significantly, no party challenges the application of AFA to Bonuts and PT or the selection of 78.17 percent as the AFA rate. Thus, the sole issue for the Court to consider is whether Commerce's determination to apply the expected method in calculating the rate to apply to non-selected respondents was lawful and supported by substantial evidence.

There should be no serious question as to the lawfulness of Commerce's reliance on the expected method. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) explicitly anticipates that Commerce use the expected method to weight-average zero, *de minimis*, and AFA rates to discern the all-others rate when no calculated rate above *de minimis* exists for a mandatory respondent in the current segment of the proceeding; hence, the term "expected method." Furthermore, the Federal Circuit held in *Albemarle* that the rates for mandatory respondents should be considered to be representative unless substantial evidence demonstrates otherwise. Commerce followed the directive of the SAA and the

guidance offered in *Albemarle* in using the expected method to calculate the rate for non-individually examined respondents.

Commerce also reasonably determined that substantial evidence did not establish that the rates for the mandatory respondents were non-reflective of the rates for the non-selected respondents. Finally, Commerce's practice with respect to the all-others rate in countervailing duty (CVD) cases is not dispositive of Commerce's practice in antidumping duty cases such as this one. Accordingly, Commerce's final results should be sustained.

## ARGUMENT

## I.    Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (citation omitted). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, when Congress has entrusted an agency to administer a statute in fact-intensive inquiries, the agency's conclusions should be reversed only if the record contains

evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

When the Court examines Commerce's interpretations of the statute it administers, it employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with Congress's clear intent. *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Indeed, "the whole point of Chevron is to leave

the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316 (citation omitted).

Finally, this Court affords Commerce an especially high level of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id*. Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039.

## II.   Commerce's Use Of The Expected Method Was Lawful And Supported By Substantial Evidence

### A.   Relevant Legal Framework

Because the governing statute is silent with respect to the calculation of the rate for companies not selected for individual examination in an administrative review, Commerce, in calculating that rate, gathers guidance from 19 U.S.C § 1673d(c)(5), which provides instructions for calculating the all-others rate in an investigation. Pursuant to subsection 1673d(c)(5)(A), Commerce calculates the all-others rate by taking a weighted average of dumping margins assigned to the individually investigated entities (*i.e.*, mandatory respondents), excluding those margins that are zero, *de minimis*, or determined entirely on the basis of AFA. *See* 19 U.S.C. § 1673d(c)(5)(A).

However, where dumping margins for all individually investigated entities are zero, *de minimis*, or determined based entirely on AFA, Commerce "may use any reasonable method to

establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." 19 U.S.C. § 1673(c)(5)(B). The SAA directs that, when the dumping margin for all of the exporters and producers that are individually investigated are determined entirely on the basis of facts available or are zero or *de minimis*, "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 873 (1994) as reprinted in 1994 U.S.C.C.A.N. 4040.

The Federal Circuit has upheld Commerce's application of the expected method in the context of administrative reviews, explaining that the general assumption underlying the statutory framework is that "the individually examined respondents account for a majority of the market during the relevant period, and are representative at the very least in terms of aggregate volume." *Albemarle*, 821 F. 3d at 1353; *see also* 19 U.S.C. 1677f-1(c)(2) (allowing Commerce to limit its examination exporters or producers, which accounts for the largest volume of subject merchandise that can be reasonably examined, when it is not practicable for Commerce to examine each company individually). "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Albemarle*, 821 F.3d at 1353; *see also Changzhou Hawd Flooring Co. v. United States*, 848 F. 3d 1006, 1012 (Fed. Cir. 2017) (*Changzhou Hawd*) ("Thus, the mandatory respondents in this matter are assumed to be representative."). "The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters." *Albemarle*, 821 F.

3d at 1353.  The Federal Circuit further explained that, in order to divert from the expected method, substantial evidence must demonstrate that that the non-examined companies' dumping behavior would be different than that of the mandatory respondents.  *Id.*; *see also Changzhou Hawd*, 848 F. 3d at 1012 ("Under *Albemarle*, Commerce could not deviate from the expected method unless it found, based on substantial evidence, that the separate rate firms' dumping is different from that of the mandatory respondents.").

### B.   Commerce's Use Of The Expected Method Was Lawful

As stated above, plaintiffs cannot seriously question whether Commerce's use of the expected method was in accordance with the law, given that Commerce adhered to the expected method, the statutory framework, and relevant binding precedent.  As an initial matter, plaintiff PrimeSource continuously frames Commerce as applying a fictitious AFA rate to the non-selected respondents.  But Commerce did not apply AFA to those respondents.  Rather, Commerce applied AFA to the mandatory, non-cooperative respondents: Bonuts and Pro-Team (an issue which no plaintiffs contest).  Then, after determining that substantial evidence did not support a finding that the mandatory respondents were unrepresentative or that the dumping patterns of the mandatory respondents differed significantly from the dumping patterns of the non-selected respondents, Commerce calculated the all-others rate using the expected method— the averaging of the zero, *de minimis*, and AFA-based rates assigned to the mandatory respondents.  IDM at 9.  Because both Bonuts and Pro-Team were assigned rates based on total AFA, Commerce calculated an all-others rate that is, in this circumstance, equivalent to the AFA rate.  *Id.*  Moreover, although PrimeSource complains that the 78.17 percent AFA rate was based on information in the petition, rather than information placed on the record by a respondent, this Court has already upheld the 78.17 percent margin as the AFA rate, as well as Commerce's

corroboration of that rate based on Pro-Team's own transaction-specific data. *See Pro-Team Coil Nail Enterprise v. United States*, Consol. Ct. No. 18-00027, Slip Op. 21-93 (Ct. Int'l Trade July 30, 2021).

PrimeSource complains that AFA-based rates are inherently unrepresentative of non-selected respondents' behavior and implicitly invites the Court to disregard the statutory scheme. PrimeSource Br. at 14-15. But these arguments ignore the explicit intention of the SAA, as well as the Federal Circuit's guidance. While it is true that 19 U.S.C. 1673d(c)(5)(B) does not mandate that Commerce use the expected method, the SAA directs that "{t}he expected method in such cases will be to weight-average the zero and de minimis margins and *margins determined pursuant to the facts available*." SAA at 873 (emphasis added). Therefore, as Commerce stated in its final results, "{w}hile both *Albemarle* and *Changzhou Hawd* contemplated *de minimis* rates, and this review contemplates the inclusion of rates based entirely on facts available, the congressionally approved 'expected method' allows for zero, *de minimis* and rates based entirely on facts available, *with no prejudice of one type of rate over another*." IDM at 18 (emphasis added). The fact that, in this instance, the mandatory respondents were both assigned AFA rates does not render Commerce's calculation of the all-others rates based on those rates, in strict accordance with the expected method, unlawful. *See Navneet Publ'ns (India) Ltd. v. United States*, 999 F. Supp. 2d 1354, 1359 (Ct. Int'l Trade 2014) ("{T}he Federal Circuit has already rejected the argument that AFA rates may not be incorporated into the all-others rate.").

PrimeSource relies heavily on *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1379 (Fed. Cir. 2012), in arguing that rates based on adverse inferences are inherently unrepresentative and are distinguishable from zero or *de minimis* rates. PrimeSource Br. at 14-15, 17, 20. But *Wujin* is inapposite, as the logic set forth in that case

applied specifically to a *hypothetical* AFA rate created for the express and sole purpose of serving as a basis for an all-others rate. *Wujin*, 701 F.3d 15 1373, 1375-76 ("The hypothetical AFA rate Commerce generated on remand was an 'AFA rate' in name only: its sole purpose was to serve as a value in the recalculation of the separate rate. The hypothetical AFA rate was not assigned to any individually investigated entity, and only affected cooperating respondents."). Indeed, the Federal Circuit in *Wujin* specifically distinguished the hypothetical AFA rate from AFA rates actually assigned to mandatory respondents. *See id.* at 1378-79. Commerce took note of this in the final results, stating that "the circumstances under which the Court found the expected method unreasonable in { } *Wujin* do not exist here." IDM at 16.

   Consolidated plaintiffs Cheng Ch., *et al.*, argue that, while the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27 (June 29, 2015) (TPEA), freed Commerce from any obligation to demonstrate that the margin selected for a non-cooperative respondent reflects some form of commercial reality, Commerce must still do so when it comes to non-selected respondents. Cheng Ch Br. at 5. But the TPEA did not revoke, refute, or in any way undermine the statement in the SAA that Commerce is expected to rely on rates consisting entirely of zero, *de minimis*, or AFA margins in situations such as the one present in the underlying review. Moreover, consolidated plaintiffs miss the thrust of *Albemarle* (a case decided after the passing of the TPEA): a presumption in favor of the representativeness of the mandatory respondents, which must be rebutted by substantial evidence to the contrary. *Albemarle*, 821 F. 3d at 1351; *see also Changzhou Hawd*, 848 F. 3d at 1012. And, as explained in more detail below, Commerce reasonably determined that substantial evidence did not support a finding of non-representativeness. Nothing in the TPEA can be reasonably construed as rendering Commerce's determination unlawful.

Consolidated plaintiffs also claim that smaller exporters will never be individually examined by Commerce and are thus being penalized by the assessment of an all-others rate based entirely on the AFA rates of the mandatory respondents.  Cheng Ch Br. at 4.  This complaint lacks merit.  As an initial matter, consolidated plaintiffs failed exhaust this argument during the underlying administrative proceeding.[1]  *See Sandvik Steel Co. v. United States,* 164 F.3d 596, 599 (Fed. Cir. 1998) (a party is not "'entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted'") (citations omitted); *Stanley Works (Langfang) Fastening Sys., Ltd. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017) (stating that exhaustion promotes judicial efficiency "by enabling an agency to correct its own errors so as to moot judicial controversies.").

Even if this Court finds consolidated plaintiffs' failure to exhaust non-prohibitive, Commerce allowed parties to comment on the CBP data and respondent selection.  CBP Data Memorandum, P.R. 7, C.R. 1.  Smaller exporters could have timely filed respondent selection comments as to Commerce's respondent selection methodology or requested voluntary respondent status and followed the statutory and regulatory criteria to become a voluntary respondent and obtain their own rates based upon their own data.  However, only petitioner Mid Continent filed timely respondent selection comments, and no party followed the statutory or regulatory requirements to become a voluntary respondent.  *See* 19 U.S.C. § 1677m(a); 19 C.F.R. § 351.204(d).  Plaintiffs should not be permitted to take a results-oriented approach by waiting and seeing whether the all-others rate is too high for their liking, then complaining that

---

[1] None of the exceptions to the exhaustion doctrine (futility, intervening judicial act, or pure legal question) apply here. *See, e.g., Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145–48 (Fed. Cir. 2013). There was no indication that Commerce would not have considered the analysis or prejudged the issue, there was no intervening judicial act, and Commerce's calculation of the non-selected rate pursuant to these facts is not a pure question of law.

they did not have the opportunity to be examined.  Moreover, there is no evidence that smaller exporters, if individually examined, would not have also received AFA rates.

PrimeSource argues that the final results contravene the Federal Circuit's decision in *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013), which held that the simple average of a *de minimis* rate and an AFA, China-wide rate led to an all-others rate not reasonably reflective of the non-selected respondents' potential dumping margins.  PrimeSource Br. at 12-13, 18-19.  But in *Bestpak*, Commerce departed from the expected method by using a simple average to calculate the all-others rate.  *Bestpak*, 716 F.3d at 1375.  Here, plaintiffs do not dispute that Commerce used the expected method.  Additionally, as explained below, Commerce considered the issue of whether the mandatory respondents' rates were reflective, and reasonably determined that the record did not contain substantial evidence that the mandatory respondents' dumping differed from that of the non-selected respondents. Moreover, in *Bestpak*, the Federal Circuit found that averaging *de minimis* and AFA rates was not *per se* impermissible, as "{19 U.S.C.} § 1673d(c)(5)(B) and the SAA explicitly allow Commerce to factor both de minimis and AFA rates into the calculation methodology."  *Bestpak*, 716 F. 3d at 1378.  Finally, the all-others rate in *Bestpak*, 123.83 percent, was nearly twice as high as the 78.17 percent all-others rate calculated for the underlying proceeding.

### C.    Substantial Evidence Does Not Support A Finding That The Dumping Of The Non-Selected Respondents Differed From The Dumping Of The Mandatory Respondents

Commerce's determination that the record did not contain substantial evidence that the mandatory respondents' dumping margins were non-reflective of those of the non-selected respondents was reasonable and supported by substantial evidence.  Commerce first distinguished the Court's non-binding, non-final decision in *Bosun Tools Co. v. United States*,

463 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) (*Bosun I*),[2] in which the Court remanded Commece's reliance on the expected method because Commerce had not considered evidence indicating that the all-others rate was not reasonably reflective.  IDM at 13.  In doing so, Commerce correctly noted that, in the underlying administrative proceeding, "Commerce has reviewed all the rates assigned in this proceeding and analyzed that data from segment to segment." *Id*.  Additionally, as Commerce observed, "73 of 75 of the non-examined companies have never been examined in any segment of the proceeding, {and} there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality." IDM at 15.  *Bosun I*, however, confined Commerce's remand to examination of evidence of margins assigned to separate rate respondents individually investigated in prior reviews. *Bosun I*, 463 F. Supp. 3d at 1319.

Commerce next examined the history of past rates assigned in prior segments of the proceeding, noting a significant number of AFA margins assigned to the individually examined respondents in the past.  IDM at 13-15.  Although plaintiffs would like to pretend that Commerce should not take into account the number of AFA rates previously assigned and that prior AFA rates do not bear on the representativeness of the mandatory respondents' rates, the 78.17 percent AFA rate is just as much part of the history of the rates assigned in the proceeding as the *de minimis* and zero rates are, and is demonstrably part of the behavior of mandatory respondents from segment-to-segment.  IDM at 13-14.  Therefore, Commerce appropriately took into account

_____

[2]  As PrimeSource concedes, the Court ultimately upheld the all-others rate assigned by Commerce, once Commerce had further examined the record and explained its reasoning. PrimeSource Br. at 28 n. 4; *see also Bosun Tools Co., Ltd. v. United States*, 493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) (*Bosun II*).  And, indeed, the situation in *Bosun II* is more analogous to the present situation than *Bosun I*.  Furthermore, *Bosun* has been appealed to the Federal Circuit, and that appeal is still pending.  *See Bosun*, Nos. 2021-1929 (Fed. Cir.)

the previously-assigned AFA in analyzed the segment-to-segment rates for mandatory respondents. IDM at 15. Commerce found that AFA was assigned "in three out of five segments"—more than half of the reviews to that point. IDM at 14. Therefore, as Commerce reasonably found, "if there is any pattern from segment-to-segment of the behavior of examined respondents, that pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA." IDM at 14.

Commerce examined the mandatory respondents most frequently examined, starting with Pro-Team, as it had been a mandatory respondent in every segment from the investigation to the current review and as it, along with the other mandatory respondents, represented the largest volume of exports that Commerce could reasonably examine for each segment. Commerce noted that Pro-Team, throughout the proceeding, had been assigned margins ranging from zero to 78.17 (the AFA rate). IDM at 14; *see also* 19 U.S.C. § 1677f-1(c)(2)(B). Commerce also found that Bonuts, another frequent mandatory respondent, was assigned AFA in the first, second, and the current administrative review. IDM at 14. Additionally, as Commerce explained, Unicatch Industrial Co., Ltd. (Unicatch), the other multiple-occasion mandatory respondent, has had a fluctuating pattern of rates in which it was assigned an AFA rate in the first administrative review, 6.16 in the second review, and 27.69 in the third review. IDM at 15. Commerce observed that the increase in Unicatch's rate from the second administrative review to the third administrative review was a 350 percent increase. *Id*. Considering the fluctuations and patterns of the mandatory respondents in previous segments, Commerce appropriately determined that "{t}here has been no indication in the history of the proceeding that the selected mandatory respondents were not representative of the experience of the non-selected companies, even when the rates of the mandatory respondents were based on AFA." IDM at 15.

16

PrimeSource incorrectly posits that Commerce must affirmatively find evidence that the non-selected rate is representative of the non-selected companies. PrimeSource Br. at 32-33. But, as demonstrated extensively above, PrimeSource has it exactly backwards. The presumption is that the rates of the mandatory respondents are reflective (even if based on zero, *de minimis*, or AFA), and, to divert from the expected method, Commerce must find substantial evidence that the rates are *not* representative. PrimeSource, perhaps recognizing the weakness of its argument, then invites this Court to reweigh the evidence already considered by Commerce, which belies the existing standard of review. *See, e.g., Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015). But even if PrimeSource's characterization of the evidence could be considered reasonable, this would not render Commerce's interpretation unreasonable or its determination unsupported by substantial evidence. *See, e.g., Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence."). Here, given the relatively large number of AFA rates assigned to mandatory respondents in previous segments, as well as the highly variable rates of Pro-Team and Unicatch, Commerce more than reasonably determined that the evidence did not support a finding that the AFA-based rates of the mandatory respondents were non-reflective.[3]

---

[3] PrimeSource also contends that Commerce should have reopened the record to solicit information regarding the non-selected respondents. PrimeSource Br. at 25. However, Commerce already allowed for the submission of factual information by the timeframes established in 19 C.F.R. 351.301(c) and no non-selected respondent timely submitted such information.

PrimeSource claims that Commerce applied an unjustifiably punitive rate to the non-selected respondents by relying on the expected method. PrimeSource Br. at 27-28. In doing so, PrimeSource primarily relies on this Court's decision in *Navneet*. However, in *Navneet*, the Court specifically held that Commerce *could* incorporate AFA rates into the calculation of the all-others rate, stating that "the all-others rate statute expressly permits the inclusion of facts available rates" and "the Federal Circuit has already rejected the argument that AFA rates may not be incorporated into the all-others rate." *Navneet*, 999 F. Supp. 2d at 1359. More importantly, *Navneet* is distinguishable, as in that case, the Court found Commerce's methodology of averaging mandatory respondents with non-mandatory, uncooperative respondents who did not respond to quantity and value questionnaires for the purposes of respondent selection unsupported by record evidence. *Id.* at 1363. Here, Commerce is only averaging the rates for the mandatory respondents, not adding in the rates of any other non-selected respondents. IDM at 16.

PrimeSource also cites *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294, 1305 (Ct. Int'l Trade 2021), for support. PrimeSource Br. at 29-30. But, in *GODACO*, the Court reasoned that Commerce did not substantiate its *departure* from the expected method, *GODACO*, 494 F. Supp. 3d at 1305, whereas Commerce actually *used* the expected method in the underlying proceeding. Moreover, as explained above, the history of the rates in this proceeding fails to show that the non-selected respondents' dumping would be significantly different from the mandatory respondents' dumping so as to justify departing from the expected method.

PrimeSource finds Commerce's determination particularly erroneous with regard to consolidated plaintiff LC, as LC had received a calculated rate in the past and "volunteered" its

information for the current review. PrimeSource Br. at 26, 33-34. But a single instance of LC as a cooperative mandatory respondent is not sufficient evidence to divert from the expected method and apply LC's rate from the prior review, particularly given the fluctuating rates of Pro-Team and Unicatch, which have both received AFA in certain segments but not others. IDM at 19. As Commerce explained, reviews must stand alone and "LC is not entitled to a special dumping margin in this review on the basis of having been previously examined." *Id*. "LC did not request an administrative review of itself nor did it participate in the respondent selection process by filing respondent selection comments or requesting voluntary respondent status." *Id*.

Regarding LC's letter stating its willingness to submit questionnaire responses, as demonstrated above, Commerce addressed this issue in the preliminary results, stating that "LC would not be eligible for selection under the applied statutory method because it is not the next largest exporter of subject merchandise in the CBP data" or even one of the next five largest exporters. PDM at 3 (citing First Respondent Selection Memo). "Therefore, LC's "willingness" to submit questionnaire responses as a respondent in this case does not qualify it for individual examination; willingness is not a consideration under {19 U.S.C. 1677f-1(c)(2)(B)}, unless a company has requested status as a voluntary respondent under {19 U.S.C. 1677m(a)} of the and fulfilled all the relevant statutory and regulatory criteria for consideration of such status." PDM at 4.

In the final results, Commerce further explained that, "{w}hen Commerce limits the number of exporters and producers examined in an investigation, {19 U.S.C. 1677m(a)} directs Commerce to establish an individual antidumping rate for any exporter or producer not initially selected for individual examination that voluntarily submits the information requested from mandatory respondents, if: (1) the information is submitted by the due date specified for

exporters or producers initially selected for examination; and (2) the number of exporters and producers subject to the investigation is not so large that any additional individual examination of such exporters and producers would be unduly burdensome and inhibit the timely completion of the investigation." LC did not satisfy these criteria. Thus, Commerce correctly determined that LC's letter, and its "willingness," did not warrant LC a special dumping margin.

### D.  Commerce Reasonably Determined To Use The Expected Method Instead Of Pulling Forward A Rate

PrimeSource suggests that Commerce could have "pulled forward" rates from the past reviews rather than using the expected method. PrimeSource Br. at 35-42. First, as already exhaustively established, Commerce reasonably determined that substantial evidence did not justify a departure from the expected method. Moreover, "{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period." *Albemarle,* 821 F.3d at 1356. Indeed, "if the facts remained the same from period to period, there would be no need for administrative reviews." *Id.* (quoting *Shandong Huarong Mach. Co. v. United States*, 29 C.I.T. 484, 490-91 (2005)). The standard set forth by *Albemarle* still requires substantial evidence that the dumping of the mandatory respondent is different from the dumping of the non-selected respondents to even consider pulling forward a rate. *Albemarle*, 821 F. 3d at 1353.

To support its argument, PrimeSource relies on Commerce's past determinations in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China*, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) (TRBs) and accompanying IDM (TRBs IDM), and *Drawn Stainless Steel Sinks from the People's Republic of China*, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018) and accompanying PDM (Sinks PDM). PrimeSource Br. at 37-38. But this reliance is misplaced, as those administrative

proceedings concerned China, a non-market economy country, whereas Taiwan has a market economy. In non-market economy cases, Commerce presumes that companies are part of the country-wide entity, but if a company can rebut that presumption of government control, Commerce will grant that company separate rate status. *See* TRBs IDM at 15-16. In other words, if a company does not rebut the presumption of government control, then that company will get the country-wide entity rate. However, if the company is able to rebut the presumption of government control, Commerce will assign a separate rate from the country-wide entity rate. Commerce would ordinarily use a rate from an individually-investigated separate rate company to calculate the separate rate. *See, e.g.,* Sinks PDM at 12; *Bosun II*, 493 F. Supp. 3d at 1353; *Refillable Stainless Steel Kegs from the People's Republic of China*, 84 Fed. Reg. 25,745 (Dep't of Commerce June 4, 2019), and accompanying PDM, and *Refillable Stainless Steel Kegs From the People's Republic of China*, 84 Fed. Reg. 57,010 (Dep't of Commerce Oct. 24, 2019), and accompanying IDM (finding that one of the selected mandatory respondents Penglai Jinfu Stainless Steel Products was part of the China-wide entity and calculating a zero rate for the separate rate respondents because the other mandatory respondent, Ningbo Master International Trade Co., Ltd. rebutted the presumption of government control, was granted separate status, and received a zero rate); *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 83 Fed. Reg. 17,527 (Dep't of Commerce Apr. 20, 2018) and accompanying IDM at 20, 27.

In the TRBs and Sinks proceedings, because the individually investigated companies were found to be part of the China-wide entity, Commerce "neither calculated any individual rates nor assigned any rates based on facts available" to be able to calculate the rate for non-selected separate rate companies. IDM at 18 (quoting *Certain Frozen Fish Fillets from the*

*Socialist Republic of Vietnam*, 83 Fed. Reg. 12,717 (Dep't of Commerce Mar. 23, 2018) and accompanying IDM). Taiwan, unlike China, is a market economy and, as such, these cases involving the presumption of government control and demonstrating independence from such control are inapposite.

PrimeSource also misguidedly cites certain countervailing duty cases to support its argument. PrimeSource Br. at 39-41. But the SAA language regarding the expected method in antidumping duty reviews is absent in the section of the SAA concerning countervailing duty reviews. *Compare* SAA at 942 *with* SAA at 873; *see also Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey*, 86 Fed. Reg. 6,866 (Dep't of Commerce Jan. 25, 2021), and accompanying IDM (CVD CWP Turkey IDM) at 5; *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 42,353 (Dep't of Commerce July 14, 2020), and accompanying IDM at 33-35. "{T}here are methodological distinctions between AD and CVD practices that make the equivalence problematic in terms of the premises behind the Federal Circuit's decision in *Albemarle*, distinctions that argue against presuming that *Albemarle* and the "expected method" have straightforward application to CVD proceedings." CVD CWP Turkey IDM at 5.

Antidumping and countervailing duty cases are conducted pursuant to distinct statutory authorities and address different types of trade practices. *Id.* (citing *Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1203 (Fed. Cir. 2014)). The Federal Circuit in *Albemarle* focused on the pricing behavior of the companies regarding alleged dumping, whereas "in the CVD context, Commerce's concern is with government subsidization and the extent to which different companies may use or benefit from the subsidy programs." *Id.* Consequently, Commerce does not apply *Albemarle* to countervailing duty cases. *Id; see, e.g.,*

*Passenger Vehicle and Light Truck Tires From the People's Republic of China*, 86 Fed. Reg. 21,275 (Dep't of Commerce Apr. 22, 2021) and accompanying IDM at 6. Commerce did not, and should not have, relied on *Aluminum Extrusions from the People's Republic of China*, 82 Fed. Reg. 57,951 (Dep't of Commerce Dec. 8, 2017), a countervailing duty administrative review, and did not act inconsistently with its relevant past practice, as PrimeSource supposes. *See* IDM at 17-18 ("However, there was no justification provided for departing from the 'expected method' in *Aluminum Extrusions CVD 2017*. Absent any reasoning for departing from the expected method in *Aluminum Extrusions CVD 2017*, and with a preponderance of other cases that have relied on the expected method, we have not relied on *Aluminum Extrusions CVD 2017*.").

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions, sustain Commerce's final results in full, and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

OF COUNSEL:                          s/Sosun Bae
VANIA WANG                           SOSUN BAE
Attorney                             Senior Trial Counsel
Department of Commerce               U.S. Department of Justice
Office of the Chief Counsel          Civil Division
  for Trade Enforcement & Compliance Commercial Litigation Branch

23

P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 305-7568

August 16, 2021                              Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 6,615 words, including text, footnotes, and headings.


<u>/s/Sosun Bae</u>
Sosun Bae

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of August, 2021, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/Sosun Bae</u>
Sosun Bae