**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| PRIMESOURCE BUILDING PRODUCTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| CHENG CH INTERNATIONAL CO., LTD., ET AL., ) | |
| ) | **Consol. Ct. No. 20-03911** |
| Consolidated Plaintiffs, ) | |
| ) | **PUBLIC DOCUMENT** |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| MID CONTINENT STEEL & WIRE, INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |

**DEFENDANT-INTERVENOR MID CONTINENT STEEL & WIRE, INC.'S
RESPONSE BRIEF**

Adam H. Gordon
Jennifer M. Smith
Ping Gong
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, N.W.
Suite 570
Washington, DC 20036
T: (202) 991-2700
E: adam.gordon@bristolgrouplaw.com
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: September 16, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT PURSUANT TO RULE 56.2 ......................................................................1

ARGUMENT .......................................................................................................................1

I.      COMMERCE'S CALCULATION OF THE ALL-OTHERS RATE IS IN
ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE ...1

     A.    Commerce's Calculation of the All-Others Rate Is in Accordance with Law
Because the Statute, the Statement of Administrative Action, and Judicial
Precedents All Support the "Expected Method" Used by Commerce ....................1

     B.    Commerce's Calculation of the All-Others Rate Is Supported by Substantial
Evidence Because There Is No Substantial Evidence That the All-Others Rate Is
Not Reasonably Reflective of the Non-Selected Companies' Potential Dumping
Margins ....................................................................................................................5

     C.    Commerce Reasonably Determined Not to Pull Forward Rates from Past Reviews
as the All-Others Rate ...........................................................................................15

II.     CONCLUSION .......................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Albemarle Corp. & Subsidiaries v. United States,*
  821 F.3d 1345 (Fed. Cir. 2016)..................................................................... *passim*

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991)......................................................................................7

*Changzhou Hawd Flooring Co., Ltd. v. United States,*
  848 F.3d 1006 (Fed. Cir. 2017)..................................................................... *passim*

*Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States,*
  701 F.3d 1367 (Fed. Cir. 2012)....................................................................11, 12

*GODACO Seafood Joint Stock Co. v. United States,*
  494 F. Supp. 3d 1294 (CIT 2021) ................................................................12

*Qingdao Qihang Tyre Co. v. United States,*
  308 F. Supp. 3d 1329 (CIT 2018) ................................................................5

*Qingdao Sea–Line Trading Co., v. United States,*
  766 F.3d 1378 (Fed. Cir. 2014).....................................................................11

*Mid Continent Steel & Wire, Inc. v. United States,*
  321 F. Supp. 3d 1313 (CIT 2018) ................................................................12, 14, 15

*Navneet Publications (India) Ltd. v. United States,*
  999 F. Supp. 2d 1354 (CIT 2014) ................................................................12

*Salman Ranch Ltd. v. United States,*
  573 F.3d 1362 (Fed. Cir. 2009)....................................................................7

*Solianus, Inc. v. United States,*
  391 F. Supp. 3d 1331 (CIT 2019) ................................................................12, 13

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
  716 F.3d 1370 (Fed. Cir. 2013).....................................................................8, 9

## STATUTES

19 U.S.C. § 1673d (c)(5)................................................................................. *passim*

19 U.S.C. § 1677m(a)(1)(A)(i) .......................................................................10

19 U.S.C. § 3512(d) ...........................................................................................................3

## REGULATIONS

19 C.F.R. § 351.301(c)......................................................................................................10

## ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Aluminum Extrusions from the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review; 2015,*
    82 Fed. Reg. 57,951 (Dep't of Commerce Dec. 8, 2017) ...................................16

*Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017,*
    83 Fed. Reg. 658 (Dep't of Commerce Jan. 5, 2018) .......................................16

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016,*
    83 Fed. Reg. 1,238 (Dep't of Commerce Jan. 10, 2018) ...................................16

## MISCELLANEOUS AUTHORITIES

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act,*
    H.R. Doc. No. 103-316 (1994) ......................................................................2, 3

## STATEMENT PURSUANT TO RULE 56.2

**1.  The Administrative Determination Under Review**

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final results of the fourth administrative review of the antidumping duty order on certain steel nails from Taiwan.  *Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 85 Fed. Reg. 76,014 (Dep't Comm. Nov. 27, 2020) (PR 92)[1] ("Final Results"); *see also* accompanying Issues and Decision Memorandum (PR 90) ("Final IDM").  The period of review is July 1, 2018, through June 30, 2019.

**2.  Issue Presented for Review**

Whether Commerce's calculation of the all-others rate assigned to non-selected companies is supported by substantial evidence and is otherwise in accordance with law.

### ARGUMENT

**I.    COMMERCE'S CALCULATION OF THE ALL-OTHERS RATE IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE**

Mid Continent adopts and incorporates by reference the arguments and analysis presented on behalf on Defendant United States in its Response Brief.  *See* U.S. Response Brief at 5-23.

**A.    Commerce's Calculation of the All-Others Rate Is in Accordance with Law Because the Statute, the Statement of Administrative Action, and Judicial Precedents All Support the "Expected Method" Used by Commerce**

Both Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") and Consolidated Plaintiffs Cheng Ch International Co., Ltd., *et al.* (collectively, "Cheng Ch") argue that Commerce's calculation of the all-others rate (78.17%) assigned to companies not selected for

---

[1] Documents on the public administrative record in this proceeding are referred to in this brief by the abbreviation "PR."

individual examination (the "non-selected companies") is not in accordance with law and not supported by substantial evidence, because they contend that this all-others rate allegedly is not reasonably reflective of the non-selected companies' potential dumping margins. *See generally*, PrimeSource Brief at 10-34 and Cheng Ch Brief at 2-6. Commerce calculated the all-others rate based on an average of the individual rates applied to mandatory respondents Bonuts (78.17%) and PT (78.17%), which were in turn based entirely on adverse facts available ("total AFA"), because both Bonuts and PT failed to respond to Commerce's questionnaire. *See* Final IDM at 9-10 (PR 90).

However, the statute, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (the "SAA"), and judicial precedents all support basing the all-others rate on the total AFA rates calculated for the mandatory respondents in this review. In general, Commerce calculates the all-others rate as the weighted average of dumping margins calculated for individually examined respondents, excluding any zero, *de minimis*, and total facts available margins. 19 U.S.C. § 1673d (c)(5)(A). However, the statute provides an exception where, as is the case here, all dumping margins calculated for individually examined respondents are zero, *de minimis*, or total facts available margins. In such cases, Commerce "may use any reasonable method" to determine the all-others rate, "including averaging" the zero, *de minimis*, or total facts available margins calculated for individually examined respondents. 19 U.S.C. § 1673d (c)(5)(B).[2]

---

[2] Although 19 U.S.C. § 1673d(c)(5) applies on its face only to investigations, Commerce generally employs the same methodology for calculating the all-others rate in administrative reviews. *See* Final IDM at 10 (PR 90); *see also*, *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1352-1353 (Fed. Cir. 2016).

Indeed, the SAA, which is recognized by Congress as an authoritative expression concerning the interpretation and application of the Tariff Act of 1930, as amended (the "Act"), *see* 19 U.S.C. § 3512(d), explains that in situations where the statutory exception applies:

> The **expected method** in such cases will be to weight-average the zero and *de minimis* margins **and margins determined pursuant to the facts available**, provided that volume data is available.  However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods.

The SAA, H.R. Doc. No. 103–316, Vol. 1 at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 (the "SAA") (emphases added).

This expected method has also been affirmed by the U.S. Court of Appeals for the Federal Circuit ("CAFC") in *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016), and *Changzhou Hawd Flooring Co., Ltd. v. United States*, 848 F.3d 1006 (Fed. Cir. 2017).  In *Albemarle*, the CAFC held that Commerce erred in using data from a previous review to determine the separate rate (the equivalent, in nonmarket economy cases, of the all-others rate) instead of basing the separate rate on an average of the *de minimis* rates calculated for mandatory respondents under the expected method:

> The SAA thus makes clear that under the statute, when all individually examined respondents are assigned *de minimis* margins, Commerce is expected to calculate the separate rate by taking the average of those margins.  Commerce may use "other reasonable methods," but only if Commerce reasonably concludes that the expected method is "not feasible" or "would not be reasonably reflective of potential dumping margins."
>
> *       *       *
>
> The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters. The statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters. As the CIT has explained, "{t}he representativeness of the

3

investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents." *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F.Supp. 1364, 1373– 74, 15 C.I.T. 548, 559 (1991).

*Albemarle*, 821 F.3d at 1352-1353.

Similarly, in *Changzhou Hawd*, the CAFC held that Commerce "could not deviate from the expected method unless it found, based on substantial evidence, that the separate-rate firms' dumping is different from that of the mandatory respondents," which it had not done in that case, and the agency erred when it assigned a separate rate that, though not specified numerically, was declared to be more than *de minimis*, even though it found zero or *de minimis* margins for all three mandatory respondents. *Changzhou Hawd*, 848 F.3d at 1011-1012.

Although both *Albemarle* and *Changzhou Hawd* deal with situations where all mandatory respondents received *de minimis* rates, the underlying rationale should apply with equal force where all mandatory respondents receive total AFA rates. This is precisely what Commerce has done here: it calculated the all-others rate based on an average of the two total AFA margins assigned to Bonuts and PT. As Commerce explained in the Final IDM:

> There is a well-established basis both in law and Commerce's practice to "calculate the nonselected respondents' dumping margin based on the mandatory respondents' rates." Moreover, in this case, and consistent with our practice and the prevailing law, Commerce has applied the "expected method" as intended by Congress.
>
> *       *       *
>
> As the case in *Qihang Tyre*, the CBP data on the record here demonstrate that the largest exporters, by volume, "were not only the two largest … but also accounted for a substantial portion of the subject merchandise exports of all exporters and producers for which Commerce had remaining requests for review." Commerce therefore had a basis, grounded in substantial record evidence and according to a statutorily-authorized method, to conclude that the two largest exporters were representative of all exporters and producers for which a review had been requested. The mandatory respondents in this case, Bonuts and PT, represent the vast majority of exports of subject merchandise, by volume,

<center>4</center>

during the POR.  In *Albemarle*, the Court opined that "the very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters."  The Court further stated that "the statute assumes that, absent such evidence, reviewing only a limited number of exporters will enable Commerce to reasonably approximate the margins of all known exporters."  As Primesource noted, the CIT stated that, "{t}he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."  In the instant review, under section 777A(c)(2), we examined the largest exporters, by volume, which also account for the vast majority of the total volume of subject exports during the POR.  Thus, the rates assigned to the mandatory respondents are representative unless substantial evidence shows otherwise, whether we had calculated a zero rate, a *de mininis* rate, or assigned to them a rate based entirely on facts available.

Final IDM at 10-11, 13 (PR 90) (citing *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1363 (CIT 2018)).

Therefore, the statute at 19 U.S.C. § 1673d (c)(5)(B), the SAA, and judicial precedents all support Commerce's calculation of the all-others rate based on an average of the total AFA margins assigned to Bonuts and PT.  PrimeSource and Cheng Ch offer no real counterargument on these points.  *See* PrimeSource Brief at 10-13; Cheng Ch Brief at 2-6.

> **B.**    **Commerce's Calculation of the All-Others Rate Is Supported by Substantial Evidence Because There Is No Substantial Evidence That the All-Others Rate Is Not Reasonably Reflective of the Non-Selected Companies' Potential Dumping Margins**

The bulk of PrimeSource's and Cheng Ch's arguments focuses on their contention that Commerce erred in applying the expected method to calculate the all-others rate because, allegedly, substantial evidence demonstrates that the resulting all-others rate is not reasonably reflective of the non-selected companies' potential dumping margins.  *See* PrimeSource Brief at 13-34; Cheng Ch Brief at 3-5.

Commerce considered and rejected similar arguments in the underlying administrative review.  Commerce  found that there is no substantial evidence that the non-selected companies'

potential dumping margins are different from those of the mandatory respondents so that the agency should deviate from the expected method of calculating the all-others rate.  Commerce explained that the history of margins in this proceeding shows that three out of five segments resulted in AFA rates being assigned to mandatory respondents.  "Therefore, if there is any pattern from segment-to-segment of the behavior of examined respondents, that pattern demonstrates that, most of the time, the mandatory respondents have failed to cooperate and have been assigned a rate based on AFA." Final IDM at 14 (PR 90).

For example, PT, a mandatory respondent in every segment, has been assigned margins ranging from zero to 78.17% (based on total AFA).  *See id.*  Bonuts has been assigned the total AFA rate every time it was selected as a mandatory respondent due to its uncooperative behavior, including in the first review, the second review, and the fourth review (the instant review).  *See id.* at 14-15.  Unicatch, another frequent mandatory respondent, received an AFA margin in the first review, a margin of 6.16% in the second review, and a margin of 27.69% in the third review (representing a 350% increase from the second review).  *See id.* at 15. Commerce reasonably concluded:

> Essentially, Huttig *et al.*'s listing of the calculated margins as "substantial evidence" lacks acknowledgement of the consistently upward trend of those margins, review to review, especially the 350 percent increase for Unicatch.  Additionally, the non-examined companies argue that the review-specific rate assigned to them is not a "commercial reality."  However, as 73 of 75 of the non-examined companies have never been examined in any segment of the proceeding, there is no evidence on this record or any other record that the 78.17 percent rate does not reflect their commercial reality.  Their claim is not substantiated by any record evidence.  Huttig *et al.* argues that the *Solianus* decision does not support the record in this review because "the 'sanctioned methodology was improperly applied in this administrative proceeding' and {Huttig} has provided substantial evidence establishing that the 78.17 percent 'all-others' rate is unreasonably high or unrepresentative of 'all other' exporters."  Based on Commerce's analysis of all the assigned rates, segment to segment, it is apparent that

> there is no pattern of "low" margins in this proceeding, as claimed by
> Huttig *et al.*  Thus, the evidence on the record does not show that the
> assumed representativeness (as recognized in *Albemarle*) for mandatory
> respondents should not apply.  We find that the facts here do not present
> a situation where our methodology is unreasonable.

Final IDM at 15 (PR 90).

PrimeSource argues that all-others rates calculated using AFA rates are "inherently" unrepresentative of the rates of non-selected companies and claims CAFC has distinguished the use of AFA from zero/*de minimis* rates when calculating the all-others rate.  *See* PrimeSource Brief at 15-21.  Essentially, PrimeSource would have the Court read "or are determined entirely under section 1677e of this title" (*i.e.*, rated determined based on total AFA) out of 19 U.S.C. § 1673d (c)(5)(B), so that Commerce would use the expected method to calculate the all-others rate only when all mandatory respondents have received zero or *de minimis* margins, but not when all of them have received AFA margins.  This is against basic canons of statutory construction.  *See*, *e.g.*, *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009) ("A cardinal rule of statutory construction is that courts should construe statutes 'so as to avoid rendering superfluous' any statutory language." (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991)).

Indeed, none of the cases cited by PrimeSource supports this claim.  In *Albemarle*, Commerce deviated from the expected method and used data from a previous review to determine the separate rate, which the CAFC found unreasonable because there was no substantial evidence that the separate rate companies' dumping was different from that of the mandatory respondents.  *See Albemarle*, 821 F.3d at 1353-1359.  Although both mandatory respondents in that case received *de minimis* margins, there is nothing in the CAFC's holding that implies the presumed representativeness of mandatory respondents' dumping for non-

selected companies' dumping would be any less if mandatory respondents received AFA margins instead of zero or *de minimis* margins.

Similarly, in *Changzhou Hawd*, Commerce deviated from the expected method and assigned a separate rate that, though not specified numerically, was declared to be more than *de minimis*, when all three mandatory respondents received zero or *de minimis* margins, which was held to be unreasonable by the CAFC because Commerce failed to demonstrate with substantial evidence that the separate rate companies' dumping was different from that of the mandatory respondents. *See Changzhou Hawd*, 848 F.3d at 1011-1012. Again, the court emphasized that "recognizing that the presumption of representativeness may be overcome, *Albemarle* holds that, in order to depart from the expected method, 'Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different." *See id.* at 1012. The court also made no distinction between AFA rates and zero/*de minimis* rates when it comes to the representativeness of the mandatory respondents' dumping.

In *Yangzhou Bestpak*, Commerce deviated from the expected method and calculated a separate rate that was a simple average of one mandatory respondent's *de minimis* margin and another mandatory respondent's AFA China-wide rate. *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1374-1376 (Fed. Cir. 2013). The CAFC held that as a matter of law, this method met the statute's standard of "any reasonable method," and held that the statute and the SAA "explicitly allow Commerce to factor both *de minimis* and AFA rates into the calculation methodology." *Id.* at 1378. However, the court found that this method was not reasonable as applied in that case, because there was no substantial evidence on the record showing that such a determination reflects the separate rate companies' economic reality. *See id.* at 1378-1380. The court did not invalidate the method used in that case because one mandatory

respondent received an AFA rate, but because the resulting separate rate did not reflect the separate rate companies' economic reality.

In contrast, here, Commerce used the expected method, unlike *Albemarle*, *Changzhou Hawd*, and *Yangzhou Bestpak*, where in each instance Commerce deviated from the expected method. In addition, after examining the history of margins determined in this proceeding, Commerce found no evidence that the mandatory respondents' dumping was not representative of the experience of non-selected companies, as discussed above. *See* Final IDM at 13-15 (PR 90). Therefore, Commerce has fulfilled all requirements set out in the statute, the SAA, and the judicial precedents in using the expected method to calculate the all-others rate, and its determination should be affirmed.

PrimeSource also attempts to downplay the multiple AFA margins assigned to mandatory respondents in the history of this proceeding, as Commerce pointed out in its Final IDM discussed above, and instead attempts to highlight the lower, calculated margins for mandatory respondents. *See* PrimeSource Brief at 21-25. However, merely because Commerce has calculated non-AFA margins in the past does not diminish the significance of the multiple AFA margins in the history of this proceeding. Given the multiple AFA margins and the fluctuating calculated margins received by PT and Unicatch, Commerce reasonably determined that "there is no pattern of 'low' margins in this proceeding, . . . Thus, the evidence on the record does not show that the assumed representativeness (as recognized in *Albemarle*) for mandatory respondents should not apply." Final IDM at 15 (PR 90).

PrimeSource next argues that Commerce could have solicited further information from the non-selected companies concerning their potential dumping margins. *See* PrimeSource Brief at 25. In particular, PrimeSource argues that this is especially true with Liang Chyuan, a non-

selected company that submitted a letter to Commerce stating its willingness to submit responses to the agency's antidumping duty questionnaire. *See id.* at 26-27. However, non-selected companies had multiple opportunities to present such information to Commerce yet chose not to do so. For example, they could have submitted factual information concerning their potential dumping margins or the non-representativeness of mandatory respondents' margins by the deadlines established in 19 C.F.R. § 351.301(c). They could have requested voluntary respondent status by submitting questionnaire responses by the deadlines set for mandatory respondents pursuant to 19 U.S.C. § 1677m(a)(1)(A)(i). However, none of them did so.

Although Liang Chyuan stated that it was willing to submit questionnaire responses, it nevertheless did not submit any such responses by the deadlines set for the mandatory respondents, thus failing to meet the requirement of 19 U.S.C. § 1677m(a)(1)(A)(i). *See* Mid Continent's Request for Total AFA to PT and Opposition to Liang Chyuan's Request at 2-4 (PR 53); *see also*, Final IDM at 20 (discussing Liang Chyuan's failure to meet the statutory directive to participate as a voluntary respondent) (PR 90).

In addition, PrimeSource argues that the non-selected companies' potential margins are lower than the all-others rate calculated by Commerce in this review because they received lower all-others rates in past reviews or because calculated margins in past reviews are lower than the all-others rate in this review. *See* PrimeSource Brief at 27-34. However, merely because the non-selected companies received lower all-others rates in past reviews or because calculated margins in past reviews are lower than the all-others rate in this review, it does not mean the all-others rate in this review is aberrational or not reflective of the non-selected companies' potential margins. After all, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Albemarle*, 821 F.3d

at 1357 (citing *Qingdao Sea–Line Trading Co., v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  More importantly, in order to justify a deviation from the expected method of calculating the all-others rate, there needs to be substantial evidence that rebuts the presumption of the representativeness of mandatory respondents' dumping, and lower all-others rates in past reviews or lower calculated margins in past reviews does not rebut such a presumption.  PrimeSource essentially argues that when mandatory respondents received lower calculated margins in past reviews (and hence the lower all-others rates calculated for non-selected companies in past reviews), their dumping was representative of the non-selected companies' dumping.  Yet when mandatory respondents received AFA margins in this review, they are suddenly not representative of the non-selected companies.  PrimeSource's reasoning is thus completely incongruous.  Without more, the Court should not conclude this constitutes substantial evidence that rebuts the presumption embedded in the statutory scheme for calculating all-others rate.

Cases cited by PrimeSource for support are all distinguishable from the instant case.  For example, in *Changzhou Wujin Fine Chemical Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012), the CAFC held that Commerce acted arbitrarily in calculating a separate rate based on an average of the *de minimis* rate calculated for one mandatory respondent and a **hypothetical** AFA rate based on U.S. price data from a non-cooperating respondent.  The court pointed out that:

> Indeed, the only AFA rates contemplated under section 1673d(c)(5)(B)'s simple average methodology are those determined for "individually investigated" parties.  Such rates are generally based on verified data, *see* 19 U.S.C. § 1677m(i)(1), and bear a reasonable relationship to the party's actual business practices.  *See Gallant Ocean*, 602 F.3d at 1323 (even "{a}n AFA rate must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent" (internal quotation marks omitted)).  Substitution of a hypothetical "AFA rate" inapplicable to any individually investigated

> party is neither suggested nor compelled by the statute, particularly
> where the sole impact of that substitution will be on cooperating parties.

*Changzhou Wujin*, 701 F.3d at 1379.  Here, Commerce used total AFA determined for

individually examined respondents Bonuts and PT, not some hypothetical AFA rate.  Therefore,

*Changzhou Wujin* is distinguishable.

In *Navneet Publications (India) Ltd. v. United States*, 999 F. Supp. 2d 1354 (CIT 2014),

Commerce calculated the all-others rate based on a simple average of zero margins calculated for

two mandatory respondents and total AFA margins assigned to two uncooperative respondents

that failed to respond to Commerce's Q&V questionnaires (who were not selected as mandatory

respondents).  *Navneet*, 999 F. Supp. 2d at 1357.  In other words, Commerce did not use the

expected method, unlike the instant proceeding, rendering this case inapposite.  Instead, in

*Navneet*, Commerce based its calculations on margins for two mandatory respondents but also

two companies not selected for mandatory examination; in contrast, both the AFA margins at

issue in the instant appeal were assigned to mandatory respondents.

In *GODACO Seafood Joint Stock Co. v. United States*, 494 F. Supp. 3d 1294 (CIT 2021),

Commerce deviated from the expected method and the court held that substantial evidence on the

record did not support such a deviation.  *See id.* at 1305-1306.  In contrast, Commerce used the

expected method to calculate the all-others rate here.

Indeed, this case is more similar to *Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331

(CIT 2019) and *Mid Continent Steel & Wire, Inc. v. United States*, 321 F. Supp. 3d 1313 (CIT

2018).  In *Solianus*, the court affirmed Commerce's calculation of the all-others rate based on an

average of the *de minimis* dumping margin calculated for one mandatory respondent and two

total AFA margins assigned to two other mandatory respondents, using the expected method.

The court explained:

Not only does Commerce's chosen methodology find support in the text of section 1673d(c)(5)(B) and the court's precedents, but Plaintiffs have failed to advance either a legal or factual reason why the Department's methodology is flawed as applied to this administrative review.

\*　　\*　　\*

But as it stands, Plaintiffs have failed to allege any specific error in the Department's application of the methodology to the facts of this case. That is, Plaintiffs have offered no reason why the resulting 30.15 percent all-others rate failed to "reflect{ } economic reality" of the "all-other" firms. The court need not (and will not) take Plaintiffs at their word that "{o}n its face, this rate does not bear a connection to the actual production experience and sales costs of an actual cooperating Korean producer or exporter." Indeed, the Department has justified the application of the sanctioned methodology to calculating the all-others rate. First, the Department selected Down Nara and Huvis as mandatory respondents in the investigation based on the assumption that, as the largest volume exporters, they were "representative of the rest of the market." Additionally, the 45.23 percent AFA rate was corroborated by "compar{ing} the 45.23 percent margin to the transaction-specific dumping margins that {the Department} calculated for TCK." And, in its analysis, Commerce "found that the dumping margin of 45.23 percent {was} not significantly higher than the highest transaction-specific margin calculated for TCK, and therefore {was} relevant and {had} probative value." Plaintiffs do not dispute these findings. Nor do Plaintiffs dispute the claim that "no information on the record { } supports Solianus' claim that it is like TCK but unlike Down Nara and Huvis." Without more evidence to support the claim that the resulting rate is not fairly representative of "all other" exporters, the court sustains the Department's application of the simple average methodology to calculate the all-others rate.

*Solianus*, 391 F. Supp. 3d at 1339-1340 (citations omitted). Similar to the plaintiffs in *Solianus*, non-selected companies here have "failed to allege any specific error in the Department's application of the methodology to the facts of this case. That is, {they} have offered no reason why the resulting {78.17} percent all-others rate failed to 'reflect{ } economic reality' of the 'all-other' firms. The court need not (and will not) take {non-selected companies} at their word that '{o}n its face, this rate does not bear a connection to the actual production experience and sales costs of an actual cooperating . . . producer or exporter.'" *Id.* at 1339.

In *Mid Continent*, Mid Continent argued that the separate rate, which was based on one mandatory respondent's (Stanley) dumping margin because the other mandatory respondent received a total AFA rate, was unreasonable as applied and did not reflect the potential dumping margins of separate rate companies, because Stanley's rate had been much lower than rates calculated for other individually examined respondents in all previous reviews.  *See Mid Continent*, 321 F. Supp. 3d at 1322-1323.  The CIT rejected this argument, stating:

> the rates assigned to non-Stanley respondents in prior segments do not demonstrate that the general rule was unreasonable as applied.  It is a commonplace [*sic*] that each "'administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.'"  *Albemarle*, 821 F.3d at 1357 (quoting *Qingdao*, 766 F.3d at 1387).  Indeed, part of the idea behind periodic reviews is to test if respondents that previously dumped have mended their ways.  While the Federal Circuit has identified circumstances where it may, nonetheless, be reasonable to use information from prior segments, those circumstances are not present here.  For example, Mid Continent makes no argument that "the overall market and the dumping margins have not changed from period to period."  *Id.*  On the contrary, the fluctuation in margins over the last several segments suggests otherwise.  Thus, "{t}his is not a situation in which there was any consistency with respect to the dumping margins of the individually examined respondents throughout the reviews."  *Id.* Additionally, there has been no allegation that the Separate Rate Companies have failed to cooperate with Commerce such that the use of higher rates from a prior segment may be justified as AFA on deterrence grounds.  *See id.*; *see also Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1378 (Fed. Cir. 2012) ("Deterrence is not relevant here, where the 'AFA rate' only impacts cooperating respondents.").

> Finally, even if circumstances were such that it was reasonable to look to information from prior segments, it is difficult to see how the prior rates of non-Stanley mandatory respondents from the last six reviews and a new shipper review are probative of the Separate Rate Companies' dumping during the POR, when only two of those respondents are among the seventeen Separate Rate Companies chosen for the underlying review: Tianjin Jinghai County Hongli Industry and Business Co., Ltd. ("Hongli") and Tianjin Jinchi Metal Products Co., Ltd. ("Jinchi").  *See* 81 Fed. Reg. at 19,218.  While it is true that Hongli and Jinchi have been individually examined before, these examinations took place in the second and third annual reviews, which covered the 2009 to

> 2010, and 2010 to 2011 periods, respectively—that is, several years prior
> to the POR of the underlying review.  Thus, there is little to suggest that
> Hongli's and Jinchi's prior rates would be indicative of the "economic
> reality and actual dumping margins," of the Separate Rate Companies
> during the POR, as Mid Continent suggests.

*Id.* at 1323-1324.  Similarly, here, lower all-others rates or lower calculated margins in past

reviews "do not demonstrate that the general rule was unreasonable as applied," and it is difficult

to see how the prior rates are probative of the non-selected companies' dumping during the POR

when only one of them has been previously examined.

In summary, given the multiple AFA margins and the fluctuating calculated margins

received by mandatory respondents in the history of this proceeding, there is no substantial

evidence on the record that shows that the non-selected companies' potential dumping margins

are different from those of the mandatory respondents so that Commerce should deviate from the

expected method of calculating the all-others rate.

### C.   Commerce Reasonably Determined Not to Pull Forward Rates from Past Reviews as the All-Others Rate

Finally, PrimeSource argues that Commerce should have pulled forward the rates

calculated for the non-examined companies in past reviews as the all-others rate in the instant

review.  *See* PrimeSource Brief at 35-42.

However, as discussed above, there is no substantial evidence on the record to support a

deviation from using the expected method to calculate the all-others rate.  Thus, Commerce has

no reason to resort to pulling forward rates from past reviews.  In addition, as Commerce

explained in the Final IDM, "{t}he act of 'pulling forward' a company-specific rate or a

calculated review-specific rate for non-examined companies from a 'temporally proximate'

review contravenes the Federal Circuit's explicit opinion in *Albemarle*."  Final IDM at 17 (PR

90).

PrimeSource claims that Commerce has a practice to pull forward rates, citing *Aluminum Extrusions from the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review; 2015*, 82 Fed. Reg. 57,951 (Dep't of Commerce Dec. 8, 2017) and accompanying Issues and Decision Memorandum ("*Aluminum Extrusions CVD 2017*").  However, as Commerce explained in the Final IDM, *Aluminum Extrusions CVD 2017* relies on two administrative cases that pre-dated *Albemarle*, and there is a preponderance of other administrative cases in which Commerce has relied on the expected method following *Albemarle*.  Final IDM at 17-18 (PR 90).  In any event, Commerce's administrative determinations are not binding on this Court.

PrimeSource's reliance on *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016*, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) ("*TRBs*") and *Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017*, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018) ("*Sinks*") is equally misplaced.  As the agency explained in its Final IDM, in *TRBs* and *Sinks*, "Commerce neither calculated any individual rates nor assigned any rates based on facts available."  Final IDM at 18 (PR 90).  Instead, Commerce found the mandatory companies to be part of the China-wide entity and assigned them the China-wide rates.  In contrast, here, Commerce has assigned AFA rates to two non-cooperative mandatory respondents in a market economy (Taiwan).

Therefore, Commerce reasonably determined not to pull forward rates from past reviews as the all-others rate as there is no substantial evidence on the record to support a deviation from using the expected method to calculate the all-others rate.

## II.    CONCLUSION

For the reasons discussed above, the Court should deny PrimeSource's and Cheng Ch's motions for judgment upon the agency record and affirm Commerce's *Final Results* in all respects.

Respectfully submitted,

*/s/ Adam H. Gordon*
Adam H. Gordon
Jennifer M. Smith
Ping Gong
Lauren Fraid
**THE BRISTOL GROUP PLLC**
1707 L Street, N.W.
Suite 570
Washington, DC 20036
T: (202) 991-2700
E: adam.gordon@bristolgrouplaw.com
*Counsel to Mid Continent Steel & Wire, Inc.*

Dated: September 16, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1) and the Scheduling Order issued by this Court on March 18, 2021 (CM/ECF No. 23), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Defendant-Intervenor Mid Continent Steel & Wire, Inc.'s Response Brief, as computed by The Bristol Group PLLC's word processing system Microsoft Word 2016, is 5,338 words.

<div align="right">

*/s/ Ping Gong*
Ping Gong
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

</div>

Dated: September 16, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of September, 2021, I electronically filed a copy of the forgoing using the CM/ECF system, which sent a notification of such filing to counsel of record for all parties.

<div style="margin-left: 40%;">

*/s/ Ping Gong*
Ping Gong
**THE BRISTOL GROUP PLLC**
*Counsel to Mid Continent Steel & Wire, Inc.*

</div>

Dated: September 16, 2021