## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| **PRIMESOURCE BUILDING PRODUCTS, INC.,** ) | |
| ) | |
| **Plaintiff and** ) | |
| ) | |
| **CHENG CH INTERNATIONAL CO., LTD.,** ) | |
| **CHINA STAPLE ENTERPRISE** ) | |
| **CORPORATION, DE FASTENERS INC.,** ) | |
| **HOYI PLUS CO., LTD., LIANG CHYUAN** ) | |
| **INDUSTRIAL CO., LTD.,** ) | |
| **TRIM INTERNATIONAL INC.,** ) | |
| **UJL INDUSTRIES CO., LTD.,** ) | |
| **YU CHI HARDWARE CO., LTD., AND** ) | |
| **ZON MON CO., LTD.,** ) | **Consol. Court No. 20-03911** |
| ) | |
| **Consolidated Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant, and** ) | |
| ) | |
| **MID CONTINENT STEEL & WIRE INC.,** ) | |
| ) | |
| **Defendant-Intervenor.** ) | |

## REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD ON BEHALF OF PLAINTIFF PRIMESOURCE BUILDING PRODUCTS, INC.

Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

October 18, 2021

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ............................................................................................................................ 1

    I.    THE RATES ASSIGNED TO THE NON-SELECTED RESPONDENTS MUST REASONABLY REFLECT THEIR POTENTIAL DUMPING MARGINS ............................ 1

    II.    COMMERCE WRONGLY FOUND THAT THE MANDATORY REPONDENTS' DUMPING MARGINS ARE REPRESENTATIVE OF ALL RESPONDENTS ...................... 5

        A.    Rates Calculated Using AFA Are Not Inherently Representative of All Exporters When the Rates Are Assigned Using AFA ...................................................................................... 6

        B.    There Was No General Trend of Non-Cooperation in This Action Such That Mandatory Respondents Were Representative of All Exporters .......................................................... 10

    III.    RECORD EVIDENCE DEMONSTRATES THAT THE RATES ASSIGNED TO NON-SELECTED RESPONDENTS WERE NOT REASONABLY REFLECTIVE OF THEIR POTENTIAL DUMPING MARGINS ......................................................................... 12

    IV.    THE ONLY REASONABLE METHODOLOGY AVAILABLE TO COMMERCE TO CALCULATE THE RATE FOR THE NON-SELECTED RESPONDENTS' IS TO CARRY FORWARD RATES FROM PAST REVIEWS ....................................................................... 17

CONCLUSION ...................................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

Albemarle Corp. & Subsidiaries v. United States,
    821 F.3d 1345 (Fed. Cir. 2016)............................................................ passim

Baroque Timber Indus. (Zhongshan) Co. v. United States,
    __ CIT __, 971 F. Supp. 2d 1333 (2014) ............................................... 9, 10

Bosun Tools Co. v. United States,
    __ CIT__, 493 F. Supp. 3d 1351 (2021) ...................................................... 14

Changzhou Hawd Flooring Co., Ltd. v. United States,
    848 F.3d 1006 (Fed. Cir. 2017)............................................................ passim

Changzhou Trina Solar Energy Co. v. United States,
    975 F.3d 1318 (Fed. Cir. 2020)................................................................... 10

Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States,
    701 F.3d 1367 (Fed. Cir. 2012)............................................................ 2, 7, 9

Chevron U.S.A., Inc. v. NRDC,
    467 U.S. 837 (1984) ........................................................................................ 3

Gallant Ocean (Thai.) Co. v. United States,
    602 F.3d 1319 (Fed. Cir. 2010)..................................................................... 7

Godaco Seafood Joint Stock Co. v. United States,
    __ CIT __, 494 F. Supp. 3d 1294 (2021) .................................................... 18

Godaco Seafood Joint Stock Co. v. United States,
    No. 18-00063, 2021 Ct. Intl. Trade LEXIS 130 (Sep. 27, 2021)......................... 18, 19

Linyi Chengen Imp. & Exp. Co. v. United States,
    No. 18-00002, 2021 Ct. Intl. Trade LEXIS 127 (Sep. 24, 2021)............................. 17

Mid Continent Steel & Wire, Inc. v. United States,
    __ CIT __, 321 F. Supp. 3d 1313 (2018) .................................................... 20

Navneet Publ'ns (India) Ltd. v. United States,
    __ CIT __, 999 F. Supp. 2d 1354 (2014) ...................................... 12, 13, 14

Pro-Team Coil Nail Enter. v. United States,
    No. 18-00027, 2021 Ct. Intl. Trade LEXIS 98 (July 30, 2021) ................................................. 11

RHP Bearings v. United States,
    288 F.3d 1334 (Fed. Cir. 2002) ............................................................................................... 22

Solianus, Inc. v. United States,
    __ CIT __, 391 F. Supp. 3d 1331 (2019) ................................................................................ 20

Yangzhou Bestpak Gifts & Crafts Co. v. United States,
    716 F.3d 1370 (Fed. Cir. 2013) ......................................................................................... passim

**Statutes**

19 U.S.C. § 1673d ..................................................................................................................... passim

**Regulations**

19 C.F.R. § 351.224 ....................................................................................................................... 14

**Other Authorities**

Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review
    and Final Determination of No Shipments; 2018-2019, 85 Fed. Reg. 76,014 (Dep't of
    Commerce Nov. 27, 2020) ................................................................................................. 3, 16

Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the
    Antidumping Duty Administrative Review and Preliminary Determination of No Shipments;
    2016-2017, 83 Fed. Reg. 658 (Dep't of Commerce Jan. 5, 2018) ........................................... 20

Stainless Steel Bar from India: Final Results of Antidumping Duty Administrative Review;
    2019-2020, 86 Fed. Reg. 47,474 (Dep't of Commerce Aug. 25, 2021).................................... 21

Stainless Steel Bar from India: Preliminary Results of Antidumping Duty Administrative
    Review; 2019-2020, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021) ...................... 21

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R.
    Rep. No. 103-316 (1994) ................................................................................................. 1, 2, 4

Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic
    of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New
    Shipper Review; 2015-2016, 83 Fed. Reg. 1,238 (Dep't of Commerce Jan. 10, 2018) ........... 20

Pursuant to Rules 56.2 and 81 of the Rules of the U.S. Court of International Trade, Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") replies to the response briefs of Defendant United States and Defendant-Intervenor Mid Continent Steel & Wire, Inc. ("Mid Continent").  <u>See</u> Def.  Resp. to Pl's Mot. for J. on the Agency R. (Aug. 16, 2021), ECF No. 26 ("Def.'s Br."); Def.-Intervenor Mid Continent Steel & Wire, Inc.'s Resp. Br. (Sept. 16, 2021), ECF No. 27 ("Mid Continent's Br.").

**ARGUMENT**

**I.   THE RATES ASSIGNED TO THE NON-SELECTED RESPONDENTS MUST REASONABLY REFLECT THEIR POTENTIAL DUMPING MARGINS**

The dumping margin Commerce assigned to the non-selected respondents was not supported by substantial evidence and was contrary to law because it failed to reasonably reflect these respondents' potential dumping margins.  The arguments by the United States and Mid Continent fail to support Commerce's determination.  Under 19 U.S.C. § 1673d(c)(5), "{i}f the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or <u>de minimis</u> margins or determined {pursuant to facts otherwise available or adverse facts available}, {Commerce} may use any reasonable method to establish the estimated all-others rate."  <u>Id.</u> (emphasis added).  The Statement of Administrative Action ("SAA") directs that "{t}he expected method in such cases will be to weight-average the zero and <u>de minimis</u> margins and margins determined pursuant to the facts available, provided that volume data is available."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, at 873 (1994), <u>as reprinted in</u> 1994 U.S.C.C.A.N. 4040, 4201.  The SAA further instructs that Commerce may use any other reasonable method when use of the expected method "would not be reasonably reflective of potential dumping margins for non-

investigated exporters or producers." <u>Id.</u>  Here, Commerce should not have relied on the expected method because the rate it assigned to the mandatory respondents based on adverse facts available ("AFA") was not a reasonable reflection of the potential dumping margins of the non-selected respondents.

The contentions by the United States and Mid Continent that Commerce's use of the expected method was in accordance with law pursuant to the significant discretion granted to Commerce to select any "reasonable method" to calculate the non-selected respondents' rate as confirmed in <u>Albemarle Corp. & Subsidiaries v. United States</u>, 821 F.3d 1345, 1352 (Fed. Cir. 2016) and <u>Changzhou Hawd Flooring Co., Ltd. v. United States</u>, 848 F.3d 1006, 1011 (Fed. Cir. 2017) ("<u>Changzhou Hawd I</u>") are without merit.  <u>See</u> Def.'s Br. at 9; Mid Continent's Br. at 3-4. PrimeSource does not challenge that the legality of the expected method.  But "{w}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case."  <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, 716 F.3d 1370, 1378 (Fed. Cir. 2013); <u>see also</u> <u>Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States</u>, 701 F.3d 1367, 1378 (Fed. Cir. 2012).  PrimeSource does not "implicitly invite{} the Court to disregard the statutory scheme."  Def.'s Br. at 11.  The relevant legal question here is not one of statutory interpretation but rather whether Commerce's selected methodology to calculate the non-selected respondents' rate was reasonable as applied.  Here, Commerce's methodology was unreasonable as applied because it failed to articulate how its reliance on an AFA rate was reasonably reflective of the non-selected respondents' potential dumping margins.

As the Federal Circuit found in <u>Bestpak</u>, while Commerce's calculation of the separate rate[1] was a permissible interpretation of the statute under <u>Chevron U.S.A., Inc. v. NRDC</u>, 467 U.S. 837, 842-43 (1984), Commerce's methodology was nonetheless unreasonable as applied given that substantial evidence did not support that a simple average of the <u>de minimis</u> and AFA China-wide rate was a reasonable reflection of the separate rate respondents' potential dumping margins. <u>See</u> <u>Bestpak</u>, 716 F.3d at 1378-80 ("Even with determinations of an AFA-rate, Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin."). "{F}orm should be disregarded for substance and the emphasis should be on economic reality." <u>Id.</u> at 1378 (citation omitted). As set forth in PrimeSource's initial brief, and elaborated below, the holding in <u>Bestpak</u> is directly analogous to the facts here because the AFA rate assigned to the mandatory respondents that Commerce used to calculate its non-selected respondents' rate was not reflective of these respondents' potential dumping margins. <u>See</u> Mem. of Points and Authorities in Support of Rule 56.2 M. for J. on the Agency Record on Behalf of PrimeSource at 18-19 (June 1, 2021), ECF No. 25 ("PrimeSource's Br.").

The United States' argument that <u>Bestpak</u> is not controlling because it is factually distinct from the present action is not compelling. While it is true Commerce departed from the expected method in <u>Bestpak</u>, <u>see</u> <u>id.</u>, unlike here, the United States ignores the threshold step that the expected method should not be used when it "would not be reasonably reflective of potential

---

[1]   The framework for calculating a separate rate in non-market economy case is equivalent to a market economy case. <u>See</u> 19 U.S.C. § 1673d(c)(5). PrimeSource, therefore, interchangeably refers to a separate rate with the non-selected respondents' rate. This is consistent with Commerce's own logic as it relies on <u>Albemarle</u> in support of its calculation methodology even though that case concerns a separate rate calculation in a non-market economy. <u>See</u> <u>Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019</u>, 85 Fed. Reg. 76,014 (Dep't of Commerce Nov. 27, 2020) ("<u>POR4 Final</u>") (P.R. 92), and accompanying Issues and Dec. Mem. at Cmt. 1 ("Final I&D Mem.") (P.R. 90); <u>see also</u> <u>Albemarle</u>, 821 F.3d at 1348.

dumping margins for non-investigated exporters or producers."  SAA, H.R. Rep. No. 103-316, at 873.  Similarly, the United States wrongly asserts that <u>Bestpak</u> is distinguishable from this action because the "the all-others rate in <u>Bestpak</u>, 123.83 percent, was nearly twice as high as the 78.17 percent all-others rate calculated for the underlying proceeding."  Def.'s Br. at 14.   Regardless of whether Commerce selects the expected method or any other "reasonable method," or whether the rate was 78.17 percent instead of 121.83 percent, Commerce's methodology must reasonably reflect the potential dumping margins of the non-selected respondents.   <u>See</u> 19 U.S.C. § 1673d(c)(5)(B).   AFA rates depend on default antidumping margins claimed in petitions instigating original investigations and vary from product to product and country to country. Commerce cannot evade the fundamental reasonableness principle of <u>Bestpak</u> by reference to even higher margins in other cases.

Instead of recognizing that <u>Bestpak</u> is controlling upon this action, i.e., that the non-selected respondents' rate must reasonably reflect respondents' potential dumping margins, the United States and Mid Continent continue to assert that Commerce's reliance on the expected method is supported by the Federal Circuit's holdings in <u>Albemarle</u> and <u>Changzhou Hawd I</u>.  <u>See</u> Def.'s Br. at 9; Mid Continent's Br. at 3-5.  Neither <u>Albemarle</u> nor <u>Changzhou Hawd I</u> require rote adherence to the expected method in every instance.  <u>See</u> PrimeSource's Br. at 12.  In both cases, in applying the statute, the Federal Circuit affirmed that Commerce may depart from the expected method when it "would not be reasonably reflective of potential dumping margins."  <u>Albemarle</u>, 821 F.3d at 1352; <u>see also</u> <u>Changzhou Hawd I</u>, 848 F.3d at 1012 (setting forth that Commerce may deviate from the expected method when the "separaterate {sic} firms' dumping is different from that of the mandatory respondents").  In <u>Albemarle</u>, the Federal Circuit references <u>Bestpak</u> to explain that an "'overriding purpose of Commerce's administration of antidumping laws is to

calculate dumping margins as accurately as possible.'"  Albemarle, 821 F.3d at 1352 (quoting Bestpak, 716 F.3d at 1379).  Albemarle, therefore, retains the underlying holding of Bestpak that the expected method is inappropriate when it results in a rate that is not a reasonable reflection of the non-selected respondents' potential dumping margins.  Further, as Mid Continent recognizes, Albemarle and Changzhou Hawd I are factually distinguishable from this action as both cases "deal with situations where all mandatory respondents received de minimis rates."  Mid Continent's Br. at 4; see also PrimeSource's Br. at 19-20.  Here, Commerce assigned a margin to the non-selected respondents that was calculated using an AFA rate. See Final I&D Mem. at Cmt. 1 (P.R. 90).

In sum, while Commerce's methodology to calculate its non-selected respondents' rate may be legally permissible under the statute, here it was nonetheless unreasonable as applied because substantial evidence did not support Commerce's selected methodology.

## II. COMMERCE WRONGLY FOUND THAT THE MANDATORY REPONDENTS' DUMPING MARGINS ARE REPRESENTATIVE OF ALL RESPONDENTS

Commerce failed to establish that its non-selected respondents' rate reasonably reflects these respondents' potential dumping margins.  The United States and Mid Continent both maintain that Commerce's use of the expected method was supported by substantial evidence and otherwise in accordance with law because the AFA rate assigned to the mandatory respondents was reasonably reflective of the non-selected respondents' dumping margins where (1) the mandatory respondents accounted for the largest volume of exports and, therefore, were representative of the non-selected respondents; and (2) the application of AFA in past reviews is indicative of a trend of non-cooperation by all respondents.  Both assumptions are fundamentally flawed.  See PrimeSource's Br. at 15-25.   Firstly, it is true that the mandatory respondents are

generally presumed to be representative of all exporters.  See Albemarle, 821 F.3d at 1353.  That presumption, however, cannot stand, nor can it represent substantial evidence to support Commerce's chosen calculation methodology, where the dumping margins for the mandatory respondents are assigned using AFA.  Secondly, record evidence does not establish a trend of non-cooperation by all exporters, but instead shows that the cooperating non-selected respondents' dumping margins are different from the uncooperative mandatory respondents' dumping margins.

### A. Rates Calculated Using AFA Are Not Inherently Representative of All Exporters When the Rates Are Assigned Using AFA

Commerce's conclusion that the rates assigned to the noncooperative mandatory respondents are presumed to be representative of all cooperative exporters unless substantial evidence shows otherwise is a clear misconstruction of Federal Circuit precedent.  See Final I&D Mem. at Cmt. 1 (P.R. 90).  For the reasons discussed below, the general presumption that the mandatory respondents are representative of all exporters by itself cannot epitomize substantial evidence supporting Commerce's finding that the non-selected respondents' rate reasonably reflected their potential dumping margins when Commerce's calculation relies on an AFA rate.

The burden falls on Commerce to support its findings with substantial evidence.  The United States asserts that PrimeSource is incorrect in arguing that Commerce "must affirmatively find evidence that non-selected rate is representative of the non-selected companies," which – in its view – conflicts with the underlying presumption that the mandatory respondents are reflective of all exporters because these mandatory respondents shipments account for a majority of the market.  See Def.'s Br. at 9, 17 (citing Albemarle and Changzhou Hawd I).  Although the Federal Circuit held in Albemarle that the data for the mandatory respondents can be "viewed as representative of all exporters," 821 F.3d at 1353, the Federal Circuit clarified in Changzhou Hawd I that Albemarle nonetheless set forth that the "presumption of representativeness may be

overcome." <u>Changzhou Hawd I</u>, 848 F.3d at 1012.   Not only may the presumption of representatives be overcome, but the "{t}he burden is not on the separate respondents to show that their dumping is the same as that of the individually examined respondents." <u>Albemarle</u>, 821 F.3d at 1353.   Instead, Commerce must support its determination with substantial evidence, which inherently requires that it show that its non-selected respondents' rate is a "reasonably accurate estimate of the respondent's actual rate." <u>Gallant Ocean (Thai.) Co. v. United States</u>, 602 F.3d 1319, 1323 (Fed. Cir. 2010); <u>see also</u> <u>Wujin</u>, 701 F.3d at 1378 (holding that "fairness or accuracy, is the 'overriding purpose' of the antidumping statue when calculating a rate for a cooperating party").

AFA rates are not inherently representative of the potential dumping margins of the non-selected cooperating respondents.  <u>See</u> PrimeSource's Br. at 16-21.  The United States maintains that PrimeSource's argument that AFA rates assigned to mandatory respondents cannot be presumed as reflective of all exporters contradicts the intention SAA, which directs that Commerce include margins based entirely on AFA when using the expected method.  <u>See</u> Def.'s Br. at 11. Similarly, Mid Continent argues that, were this Court to adopt PrimeSource's arguments, Commerce could only use "the expected method to calculate the all-others rate only when all mandatory respondents have received zero or <u>de minimis</u> margins, but not when all of them have received AFA margins."  Mid Continent's Br. at 7.  The United States and Mid Continent misunderstand PrimeSource's argument.  PrimeSource does not assert that a rate assigned using AFA cannot be included in the weighted average under the expected method.  Instead, relying on the precedent discussed below, PrimeSource argues that dumping margins based on AFA cannot be presumed to be representative of the potential dumping margins of the non-selected respondents

solely because the shipments of the mandatory respondents represent the largest percentage of market.

As the actual margins of the mandatory respondents were "unknown" given that they were calculated using AFA grounded in their "lack of participation," Commerce's cannot "cannot base a determination of economic reality on such slim findings." Bestpak, 716 F.3d at 1379. Commerce's finding that the AFA rate was reasonably reflective of the non-selected respondents' potential dumping margins is even more egregious than Bestpak. In Bestpak, the record at least contained some additional evidence, AUV estimates, showing that the rate calculated using AFA for a mandatory respondent may have been reflective of the separate rate respondents potential dumping margins. See id. Nonetheless, the Federal Circuit determined that the record did not contain substantial evidence that would tie the AFA rate to Bestpak's commercial activity. See id. at 1380. Here, Commerce conducted no such AUV comparison between the mandatory respondents and non-selected respondents and instead relied upon the general presumption of the representativeness of mandatory respondents' rates. See Final I&D Mem. at Cmt. 1 (P.R. 90). Although an AFA rate may be representative of the non-selected respondents' dumping margins, such a finding must be supported with substantial evidence on the record and Commerce may not merely rely on the presumption that mandatory respondents are representative of all exporters.

Nor does PrimeSource's claim that AFA rates are inherently unrepresentative in this case conflict with Federal Circuit precedent as maintained by the United States and Mid Continent. See Def.'s Br. at 11; Mid Continent's Br. at 7-9. As the Federal Circuit recognized in Wujin, the inherent unrepresentativeness of AFA rates is evident in the 19 U.S.C. § 1673d itself. In Wujin, the Federal Circuit firmly distinguished the use of AFA from zero/de minimis rates when calculating the all-others rate where the former is inherently unrepresentative and "disfavored by

the statute." <u>Wujin</u>, 701 F.3d at 1379.  The United States and Mid Continent contend that <u>Wujin</u> is inapposite because the "logic set forth in that case applied specifically to a <u>hypothetical</u> AFA rate created for the express and sole purpose of serving as the basis for an all-others rate."  Def.'s Br. at 11-12; <u>see also</u> Mid Continent's Br. at 11.  The Federal Circuit, however, based its conclusion on the statute itself, explaining that "section 1673d(c)(5)(B) is an exception to the preferred method in section 1673d(c)(5)(A), which instructs that AFA rates, like <u>de minimis</u> and zero rates, should be excluded."  <u>Wujin</u>, 701 F.3d at 1379.  The particular facts of <u>Wujin</u> merely support the Federal Circuit's broader holding that AFA rates are disfavored based on its plain language reading of the statute.  <u>See id.</u>

The sound reasoning underlying the court's holding in <u>Baroque Timber Indus. (Zhongshan) Co. v. United States</u>, __ CIT __, 971 F. Supp. 2d 1333 (2014) further advances PrimeSource's assertion that AFA rates cannot be presumed to be reflective of the potential dumping margins of non-selected respondents.  In <u>Baroque Timber</u>, the court explained that "{a}pplication of the AFA rate to non-cooperating parties is a rebuttable presumption.  A rebuttable presumption is not evidence.  Even if it were, the fact that the AFA rate applies to other companies is not evidence of dumping on the part of the separate rate companies."  <u>Id.</u> at __, 971 F. Supp. 2d at 1343 (internal citations omitted).   In fact, <u>Baroque Timber</u> expressly references <u>Wujin</u> to support its conclusion that "Commerce cannot use the AFA rate in calculating the separate rate for cooperating parties without explanation." <u>Baroque Timber</u>, __ CIT at __, 971 F. Supp. 2d at 1343 (citing <u>Wujin</u>, 701 F.3d at 1379).  This court should find the reasoning in <u>Baroque Timber</u> to be persuasive because the Court directly addressed the inclusion of AFA rates in the expected method, the applicable issue on appeal in this action.

Here, as discussed below, Commerce did not provide a reasonable explanation for using the expected method because the record demonstrates that the AFA rate assigned to the mandatory respondent was not reasonably reflective of the non-selected respondent's potential dumping margins.

### B. There Was No General Trend of Non-Cooperation in This Action Such That Mandatory Respondents Were Representative of All Exporters

The United States and Mid Continent next argue that the mandatory respondents' dumping margins are reasonably reflective of all exporters based on Commerce's assignment of AFA rates to certain mandatory respondents in past reviews.  See Def.'s Br. at 15-16; Mid Continent's Br. at 9.  No reasonable reading of the record supports Commerce's conclusion in the Final Results that the application of AFA in past reviews is indicative of a trend of non-cooperation by all respondents.  See Final I&D Mem. at Cmt. 1 (P.R. 90).

The United States maintains that PrimeSource improperly asks this Court to reweigh the evidence contrary to the standard of review.  See Def.'s Br. at 17.  This is not the case.  Rather, PrimeSource instead emphasizes that substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from the substantiality of the evidence."  Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (citation omitted).  "While it is true that under substantial evidence the court 'do{es} not make the determination,' it "merely vet{s} the determination," Commerce's calculation may fail to meet the substantial evidence threshold where it does not "articulate the required rational connection between the facts found and the rate chosen."  Baroque Timber, __ CIT at __, 971 F. Supp. 2d at 1345 (internal citations omitted).   When the record is fairly examined, including information that fairly detracts from the weight of Commerce's conclusion,

10

the only reasonable conclusion is that there is no significant trend of non-cooperation by past mandatory respondents such that the AFA rate can be presumed to be reasonably reflective of the potential dumping margins of the non-selected respondents.  See PrimeSource's Br. at 21-24.

The United States claims that "most of the time, the mandatory respondents have failed to cooperate."  Def.'s Br. at 16.  This argument vastly overstates the record.  Commerce calculated an actual rate for mandatory respondents in most of the past reviews.  See PrimeSource's Br. at 22-23.  In the ongoing litigation concerning the first administrative review, the Court sustained Commerce's remand redetermination to calculate a zero percent antidumping margin for Pro-Team Coil Nail Enterprise Inc. ("ProTeam") / PT Enterprise Inc. ("PT").  See id. at 23-34.[2]  With Commerce's remand redetermination factored into an analysis of the rates calculated for mandatory respondents in past reviews, now only one mandatory respondent, Bonuts, has received an AFA rate in every proceeding before Commerce.  See PrimeSource's Br. at 24.  The fourth administrative review is now the only proceeding in the steel nails from Taiwan case where all the mandatory respondents were assigned a rate based on AFA.  See id.  No reasonable reading of the record can support Commerce's claim that the past reviews indicate a history of non-cooperation by the mandatory respondents, see Final I&D Mem. at Cmt. 1 (P.R. 90), when only one mandatory respondent has been assigned an AFA rate in every proceeding for which it has been individually

---

[2] The court has recently sustained Commerce's selection of the petition rate as AFA for Unicatch and remanded "Commerce's use of a simple average of the mandatory respondents' rates to establish the rate for non-individually examined respondents."  Pro-Team Coil Nail Enter. v. United States, No. 18-00027, 2021 Ct. Intl. Trade LEXIS 98, at *5 (July 30, 2021).  As the Court noted in that opinion, it had already sustained the zero percent rate for Pro-Team.  Id. at *3.  In its final remand redetermination, Commerce used a weighted average under the expected method to calculate a new non-selected respondent rate of 35.30 percent.  See Final Results of Redetermination Pursuant to Court Remand, Pro-Team Coil Nail Enter., Inc. v. United States, Consol. Ct. No. 18-00027 (Oct. 13, 2021), ECF 127.  Commerce's remand redetermination is still pending a final judgment by the Court.

reviewed.  Further, prior to the fourth administrative review, the instances where Commerce has calculated a rate for the mandatory respondents significantly outnumber the dumping margins that Commerce has assigned using AFA.  See PrimeSource's Br. at 24.

For these reasons, no reasonable reading of the record supports the United States' and Mid Continent's claim that there is a general trend of non-cooperation such that it can be presumed that mandatory respondents' dumping margins were reflective of all exporters.

### III.   RECORD EVIDENCE DEMONSTRATES THAT THE RATES ASSIGNED TO NON-SELECTED RESPONDENTS WERE NOT REASONABLY REFLECTIVE OF THEIR POTENTIAL DUMPING MARGINS

When the record is fairly examined, including information that fairly detracts from the weight of Commerce's determination, the only reasonable conclusion is that the non-selected respondents' dumping margins are significantly lower than the AFA rate assigned to the mandatory respondents.  In past reviews when Commerce calculated a dumping margin for the mandatory respondents, these rates were significantly lower than the AFA rate assigned to the mandatory respondents in the current review.  Commerce, therefore, acted unreasonably by using the expected method to average the AFA rates to calculate the fully cooperative non-selected respondents' margins.  See Bestpak, 716 F.3d at 1380 ("The result is not only limited and frustrating . . . but is also unreasonable.").

One sanctioned method of determining whether a dumping margin assigned to non-mandatory respondents is supported by substantial evidence is to compare the AFA rate in the relevant review to rates calculated in past reviews.  See Navneet Publ'ns (India) Ltd. v. United States, __ CIT __, __, 999 F. Supp. 2d 1354, 1363-65 (2014).  For instance, in Navneet, the Court held that Commerce's methodological choice was not supported by substantial evidence because: 1) Commerce did not supply corroborative evidence that an AFA rate was reflective of the

uninvestigated respondents pricing behavior, and 2) the validity of the representativeness of Commerce's calculation was undermined by the fact that the all-others rates calculated in past reviews were significantly lower than the rate calculated in the review under appeal.  See id. Finding that the rates from prior reviews demonstrated that Commerce's all-others rate calculation was not representative of the non-selected companies' dumping margins, the Court remanded Commerce's calculation "{to} reconsider its methodology as applied in this case."  Id. at __, 999 F. Supp. 3d at 1366.    The United States and Mid Continent both claim that Navneet is distinguishable because, there, Commerce did not use the expected method to calculate its non-selected respondents' rate and instead included certain AFA rates in its average that were assigned to non-mandatory respondents who were not selected for review.  See Def.'s Br. at 18; Mid Continent's Br. at 12.[3]  The particular facts of Navneet, however, do not change the Court's underlying holding that rates calculated from past reviews are persuasive evidence of whether an AFA rate calculated for a respondent due its non-participation is reflective of the potential dumping margins of other cooperating non-selected respondents.

Here, the calculated rates from prior reviews are significantly lower than the AFA rate assigned to the mandatory respondents.  As Commerce recognized, it had calculated rates of 2.16 percent, 0 percent, 0 percent and 6.72 percent for ProTeam/PT in past reviews and a rate of 2.54 percent for Liang Chyuan Industrial Co., Ltd. ("Liang Chyuan") in the prior third administrative

---

[3] The United States also argues that Navneet held that "the all-others rate statute expressly permits the inclusion of facts available rates."  Def.'s Br. at 18 (quoting Navneet, __ CIT at __, 999 F. Supp. 2d at 1359).  Again, PrimeSource does not argue that AFA rates can be included in the all-others rate calculation, but that their inclusion may not be reasonable as applied.  Indeed, the Court in Navneet noted that it is required to consider whether substantial evidence "support{s} the reasonableness of Commerce's methodological choice."  Navneet, __ CIT at __, 999 F. Supp. 2d at 1362.  In line with Bestpak, the Court emphasized that in undertaking this analysis the "emphasis should be on economic reality."  Id. (citation omitted).

review.  See PrimeSource's Br. at 31.  Further, Commerce calculated a rate of 6.16 percent for

Unicatch Industrial Co. Ltd. ("Unicatch") in the second administrative and a rate of 27.69 percent

in the third administrative review.  See PrimeSource's Br. at 24.  On their face, these rates are

significantly lower than the AFA rate assigned to the mandatory respondents based on their failure

to participate in this review.  The AFA rate assigned to the mandatory respondents, i.e., 78.17

percent, "appears aberrational because it is significantly higher than all prior margins calculated

for cooperative respondents."  Navneet, __ CIT at __, 999 F. Supp. 3d at 1365.  Such aberrational

rates are "unjustifiably high and may amount to being punitive."  Bestpak, 716 F.3d at 1379.

To get this Court to disregard this substantial evidence, the United States maintains that

Commerce properly considered the rates assigned in past administrative reviews and found that

there was a 350 percent increase in Unicatch's rate between the second and third administrative

review and that this increase was indicative of a general trend of increasing dumping margins.  See

Def.'s Br. at 16 (citing Final I&D Mem. at Cmt. 1 (P.R. 90)).[4]  A comparison in a percentage

change between reviews is meaningless where the dumping margins are small in the first instance.

See PrimeSource's Br. at 32 ("For instance, an increase from a one percent margin to a 5 percent

margin would represent an increase of 500 percent.").  The argument that a relative margin change

is only one measure of whether a difference is significant is supported by Commerce's own

regulatory definition of "significant' that it uses in deciding whether to correct ministerial errors

in a preliminary determination.  See 19 C.F.R. § 351.224 (setting forth that Commerce will only

---

[4] PrimeSource recognizes that the Court has previously held that Commerce's use of AFA rates to calculate a separate rate was supported by substantial evidence on the basis that "more contemporaneous rates reflect an upward trend" in the dumping margins.  Bosun Tools Co. v. United States, __ CIT__, __, 493 F. Supp. 3d 1351, 1357 (2021).  Bosun, however, is not binding upon this Court and, as the United States recognizes, Bosun is currently on appeal at the Federal Circuit.  See Def.'s Br. at 15, n. 2.

correct a "significant ministerial error" in a preliminary determination where the error "{w}ould result in a change of at least five absolute percentage points, but not less than 25 percent of, the weighted-average dumping margin . . . calculated in the original (erroneous) preliminary determination").  Here, the small variations in the early review periods may appear significant in relative terms, but the nominal changes were minimal and not significant.   Unicatch's dumping margin increased by 21.53 percentage points between the second and third reviews.   See PrimeSource's Br. at 24.  Under Commerce's AFA logic, Unicatch's dumping margin increased by 50.48 percentage points between the third and fourth review.  Such an increase, almost double the change between the second and third review, is not supported by the record given that the dumping margins calculated for ProTeam, the other party selected as a mandatory respondent in every prior review, remained the same between the first and second reviews and only increased by 6.72 percentage points between the second and third reviews.  Defendant's reliance on calculating relative percent change is little more than a mathematical parlor trick.  The record, thus, does not support Commerce's conclusion that the AFA rate assigned to the mandatory respondents was reasonably reflective of the non-selected respondents' potential dumping margins.

Commerce's rate calculation is demonstrably not supported by substantial evidence and not in accordance with law for Liang Chyuan, a company previously assigned a rate of 2.54 percent as a first-time mandatory respondent in the third administrative review.  See PrimeSource's Br. at 24, 31.  The United States counters that "a single instance of {Liang Chyuan} as a cooperative mandatory respondent is not sufficient evidence to divert from the expected method."  Def.'s Br. at 19.  This statement ignores record evidence which establishes that the AFA rate did not reasonably reflect Liang Chyuan's potential dumping margin.  Unlike Unicatch or Bonuts, Liang Chyuan has never been assigned a rate based on AFA based on its failure to participate as a

mandatory respondent.  Further, there is no evidence to support Commerce's conclusion that Liang Chyuan's dumping history would have changed from the prior review when Commerce itself has found Liang Chyuan to be fully cooperative in the current review.  See POR4 Final, 85 Fed. Reg. at 76,016 (P.R. 92).  Finally, unlike Unicatch, there is no evidence on the record that Liang Chuyuan's dumping margin has increased from previous reviews.  The only evidence on the record establishes that Liang Chuyaun's dumping margin was significantly lower than the AFA rate assigned to the mandatory respondents.  Commerce's use of the expected method to calculate Liang Chuyan's rate using an AFA rate was not supported by substantial evidence because it does not reasonably reflect the potential dumping margin of Liang Chuyan.  See Bestpak, 716 F.3d at 1378.

If Commerce had any doubt that Liang Chyuan's rate had changed from the third administrative review, it could have sought further information from Liang Chyuan.  See Albemarle, 821 F.3d at 1358.  Liang Chuyan made itself available to Commerce, stating that "it is willing and able to submit a response to {Commerce}'s antidumping duty questionnaire in this segment of the proceeding."  Letter on Behalf of Liang Chyuan to Dep't of Commerce re: Comments on Sampling Determination at 2 (Feb. 3, 2020) (Public Document) (P.R. 52).  The United States and Mid Continent maintain that Liang Chyuan did not submit the information necessary to request voluntary respondent status nor did it submit any information pursuant to Commerce's deadlines to provide factual information.  See Def.'s Br. at 13; Mid Continent's Br. at 10.  These arguments fail because they ignore Federal Circuit precedent establishing that Commerce must support its dumping margin calculations with substantial evidence.  The Federal Circuit has confirmed that Commerce has broad authority to request information from separate rate respondents and has reopened the record to confirm that its separate rate matches the potential

dumping margins of the separate rate respondents.  See <u>Albemarle</u>, 821 F.3d at 1358.  The Federal Circuit has also previously rejected arguments by Commerce that its separate rate calculation was as accurate as possible based on a limited record when it was aware early in the preceding that the mandatory respondent would be unresponsive.  See <u>Bestpak</u>, 716 F.3d at 1380; <u>see also</u> <u>Linyi Chengen Imp. & Exp. Co. v. United States</u>, No. 18-00002, 2021 Ct. Intl. Trade LEXIS 127, at *20-21 (Sep. 24, 2021) (holding that "Commerce created its own problems when it selected only two mandatory respondents, which resulted in sparse information on the record to support its assertions regarding the potential dumping margins of the separate rate respondents").  Here, Commerce was aware early in the review that the mandatory respondents would be unresponsive and had the authority to request additional information from Liang Chyuan concerning its alleged dumping practices in the current review.  Commerce cannot now rely on the "absence of evidence by invoking procedural difficulties that were at least in part a creature of its own making." <u>Albemarle</u>, 821 F.3d at 1378 (citing <u>Bestpak</u>, 716 F.3d at 1378).

The AFA rate that Commerce calculated for the non-selected respondents using the expected method was not reasonably reflective of non-selected respondents', especially Liang Chyuan's, potential dumping margins based on the history of this case.

## IV.  THE ONLY REASONABLE METHODOLOGY AVAILABLE TO COMMERCE TO CALCULATE THE RATE FOR THE NON-SELECTED RESPONDENTS' IS TO CARRY FORWARD RATES FROM PAST REVIEWS

Given that the record establishes that the AFA rate was not reasonably reflective of the non-selected respondents' potential dumping margins, the only reasonable methodology available to Commerce to calculate its non-selected respondents' rate was to carry forward the prior rates of Liang Chyuan (2.54 percent or 2.16 percent), Hor Liang and Romp Coil (12.90 percent or 2.16 percent) and Unicatch (27.69 percent, 6.16 percent or 2.16 percent).

17

The United States and Mid Continent assert that carrying forward past rates contradicts the premise that each administrative review is a separate proceeding.  See Def.'s Br. at 20 and Mid Continent's Br. at 11 (both citing Albemarle, 821 F.3d at 1356-57).   The United States' and Mid Continent's reliance on Albemarle is misplaced as the Federal Circuit acknowledged in that case that "use of data from a prior period may be reasonable . . . where there is evidence that the overall market and the dumping margins have not changed from period to period."  Albemarle, 821 F.3d at 1357.  Here, as detailed above, the rates calculated for the mandatory respondents, as opposed those rates merely assigned using AFA due to a mandatory respondent's lack of participation in prior administrative reviews, establish that the dumping margins have remained consistent throughout this case.

The Court has upheld Commerce's practice of carrying forward rates.  In Godaco Seafood Joint Stock Co. v. United States, __ CIT __, 494 F. Supp. 3d 1294 (2021) ("Godaco I"), the Court remanded "Commerce's assignment of the total AFA rate to fully cooperating Separate Rate Plaintiffs {using the expected method} as unreasonable and not in accordance with law" where "evidence on the record suggests instead that Separate Rate Plaintiffs' rate may be reasonably closer to the . . .rate assigned to separate rate respondents in the prior twelfth administrative review, rather than the total AFA rate . . . from the thirteenth administrative review."  Id. at __, 494 F. Supp. 3d at 1306.  The court recently upheld Commerce's remand redetermination to calculate the all-others by applying a simple average of the separate rates assigned in the four prior administrative reviews of the antidumping duty order and then assigning that average rate to the separate rate plaintiffs.  See Godaco Seafood Joint Stock Co. v. United States, No. 18-00063, 2021 Ct. Intl. Trade LEXIS 130, at *4-5 (Sep. 27, 2021) ("Godaco II").   In carrying forward rates from prior administrative review, Commerce explained that these past rates "were more

18

contemporaneous than the AFA rate previously assigned to the Separate Rate Plaintiffs." Id. at *10.  This Court should be guided by the reasoning in Godaco I and Godaco II because the facts in that case are directly analogous to this action.  In Godaco I and Godaco II, the Court found that Commerce's separate rate calculation using an AFA rate was not reasonably reflective of the separate respondents potential dumping margins when compared to the rates that had been calculated in prior reviews and then the Court upheld Commerce's remand redetermination to carry forward past rates.   Here too, Commerce erred by relying on an AFA rate to calculate its non-selected respondents' rate when other rates calculated by Commerce in past reviews demonstrate that Commerce's calculation was not reflective of the non-selected respondents' potential dumping margins.  As Commerce explained in its remand redetermination, rates calculated in past reviews can be more contemporaneous than rates calculated assigned using AFA calculated years earlier. Godaco II, No. 18-00063, 2021 Ct. Intl. Trade LEXIS 130, at *5.   Such is the case here where the information used to calculate Commerce's AFA rate dates to the initial petition as opposed to more recent information calculated in past reviews.  See PrimeSource's Br. at 17-18.

The United States and Mid Continent both attempt to distinguish Godaco I from the present action, reasoning that the central issue in that case was that "Commerce did not substantiate its departure from the expected method."  Def.'s Br. at 18 (emphasis removed); see also Mid Continent's Br. at 12 (noting that "Commerce deviated from the expected method and the court held that substantial evidence on the record did not support such a deviation").  Again, the United States and Mid Continent ignore the central tenant of the SAA that Commerce's non-selected respondents' rate must reasonably reflect these respondents' potential dumping margins regardless of whether Commerce uses the preferred expected method or any other reasonable method.

Further, Mid Continent's argument that this case is more similar to Solianus, Inc. v. United States, __ CIT __, 391 F. Supp. 3d 1331 (2019) and Mid Continent Steel & Wire, Inc. v. United States, __ CIT __, 321 F. Supp. 3d 1313 (2018) than Godaco I is equally uncompelling. See Mid Continent's Br. at 12.  In Solanius, Commerce took a simple average of a de minimis rate and two AFA rates given that Plaintiffs did not dispute the claim that there was no information on the record that their dumping margin was more similar to the mandatory respondent that received a de minimis rate than the mandatory respondents who received rates based on AFA.  Solianus, __ CIT at __, 391 F. Supp. 3d at 1339.  Here, such evidence exists, given that the rates calculated in past administrative reviews demonstrate that the AFA rate was not reasonably reflective of the non-selected respondents' potential dumping margins.   Similarly, in Mid Continent, the Court concluded that it was not reasonable to use rates from prior segments to calculate the non-selected respondent because Plaintiff made no argument that "the overall market and the dumping margins have not changed from period to period."  Mid Continent, __ CIT at __, 321 F. Supp. 3d at 1323 (citation omitted).  Here, record evidence shows that the market has remained relatively consistent in past reviews.

Commerce's determination in Godaco II is also consistent with its practice to carry forward rates in other investigations.  See PrimeSource's Br. at 37 (citing Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, and Rescission of New Shipper Review; 2015-2016, 83 Fed. Reg. 1,238, 1,239 (Dep't of Commerce Jan. 10, 2018) ("TRBs") and Drawn Stainless Steel Sinks from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017, 83 Fed. Reg. 658, 659 (Dep't of Commerce Jan. 5, 2018) ("Sinks")).  Defendant and Mid Continent both claim

20

that the <u>Sinks</u> and <u>TRBs</u> cases are distinguishable from this action on the basis that "Commerce neither calculated any individual rates nor assigned any rates based on facts available" because it found the mandatory companies to be part of the China-wide entity.  <u>See</u> Def.'s Br. at 21 and Mid Continent's Br. at 16 (both quoting Final I&D Mem. at Cmt. 1 (P.R. 90)).  As PrimeSource explained in its opening brief, "the China-wide entity rate is directly comparable to a rate fully based on AFA because in assigning a China-wide rate, Commerce is not calculating an actual rate for the respondent.'"  PrimeSource's Br. at 38.  Commerce's underlying rationale for carrying forward rates from prior reviews in <u>Sinks</u> and <u>TRBs</u>, therefore, is directly applicable here given that the rates calculated for the mandatory respondents were unknown because they were calculated using AFA based on allegations in the original antidumping petition wholly divorced from the cooperating all-others rate respondents.  <u>See</u> <u>Bestpak</u>, 716 F.3d at 1379.

Significantly, in a recent market economy case, Commerce determined that "{c}onsistent with the {Federal Circuit}'s decision in <u>Albemarle</u>, in this review, we preliminarily determine that a reasonable method for determining the rate for the only non-selected company, Ambica, is to pull forward the dumping margin applied to Ambica in the most recently completed administrative review." <u>Stainless Steel Bar from India: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020</u>, 86 Fed. Reg. 11,235 (Dep't of Commerce Feb. 24, 2021), and accompanying Dec. Mem. at 8 ("SSB I&D Mem."), unchanged in <u>Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review; 2019-2020</u>, 86 Fed. Reg. 47,474, 47,475 (Dep't of Commerce Aug. 25, 2021).  In that case, Commerce reasoned that Ambica had consistently received a zero percent dumping margin and, therefore, "applying the AFA-based dumping margin applied to the sole mandatory respondent in this instant review . . . would not be reasonably reflective of Ambica's actual dumping margin."  SSB I&D Mem. at 9. This is the exact scenario

presented in this action.  The record here "presents consistency with respect to the dumping margins of the individually examined respondents," and, consequently the rates calculated in prior reviews represent the "most accurate and current possible rate."  <u>Id.</u> at 8-9.  Commerce's determination to rely on the expected method was arbitrary and capricious given that it correctly pulled forward prior rates in a market economy case with near identical facts to this action based on the holding in <u>Albemarle</u>.  <u>See</u> <u>RHP Bearings v. United States</u>, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("{a}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (citation omitted)).

Carrying forward certain calculated rates from the past reviews is the only reasonable method that ensures that Commerce's review-specific rate calculation reasonably reflects the potential dumping margins of the non-selected respondents.  Any other methodology, including Commerce's selection of the expected method, results in an application of a punitive rate to cooperating non-selected respondents. <u>See</u> <u>Albemarle</u>, 821 F.3d at 1354.

## CONCLUSION

For the foregoing reasons, the Court should grant PrimeSource's motion for judgment on the agency record and remand the final determination for redetermination consistent with the points of law and record evidence discussed in PrimeSource's initial brief and this reply brief.

Respectfully submitted,

<u>Dated</u>: October 18, 2021

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
*Counsel to PrimeSource Building Products, Inc.*

22

**CERTIFICATE OF COMPLIANCE**

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,991 words.


Dated: October 18, 2021                         /s/ Jeffrey S. Grimson
                                                Jeffrey S. Grimson
                                                Mowry & Grimson, PLLC
                                                5335 Wisconsin Avenue, NW, Suite 810
                                                Washington, D.C. 20015
                                                202-688-3610
                                                trade@mowrygrimson.com
                                                *Counsel to PrimeSource Building Products,*
                                                *Inc.*