## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| **PRIMESOURCE BUILDING PRODUCTS, INC.,** | ) |
| | ) |
| **Plaintiff and** | ) |
| | ) |
| **CHENG CH INTERNATIONAL CO., LTD.,** | ) |
| **CHINA STAPLE ENTERPRISE** | ) |
| **CORPORATION, DE FASTENERS INC.,** | ) |
| **HOYI PLUS CO., LTD., LIANG CHYUAN** | ) |
| **INDUSTRIAL CO., LTD.,** | ) |
| **TRIM INTERNATIONAL INC.,** | ) |
| **UJL INDUSTRIES CO., LTD.,** | ) |
| **YU CHI HARDWARE CO., LTD., AND** | ) |
| **ZON MON CO., LTD.,** | ) **Consol. Court No. 20-03911** |
| | ) |
| **Consolidated Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES,** | ) |
| | ) |
| **Defendant, and** | ) |
| | ) |
| **MID CONTINENT STEEL & WIRE INC.,** | ) |
| | ) |
| **Defendant-Intervenor.** | ) |
| | ) |

## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff PrimeSource Building Products, Inc. ("PrimeSource") respectfully submits this Notice of Supplemental Authority to advise this Court of the opinion of the U.S. Court of Appeals for the Federal Circuit (the "Federal Circuit") in Bosun Tools Co., Ltd. v. United States, Consol. Ct. Nos. 2021-1929, 2021-1930 (Fed. Cir. Jan. 10, 2022) ("Bosun III").

This decision, which was issued subsequent to PrimeSource filing its reply brief in the present action, supports PrimeSource's claim that Commerce's reliance on an AFA rate to

calculate the non-selected respondents' rate was not supported by substantial evidence because other record evidence, i.e., rates calculated for the mandatory respondents in past reviews as opposed to rates assigned using AFA, demonstrated that Commerce's calculation did not reasonably reflect the non-selected respondents' potential dumping margins.  See PrimeSource 56.2 Br. at 27-34; see also PrimeSource Reply Br. 12-17.  As the Federal Circuit noted in Bosun III, the Court of International Trade ("CIT") initially remanded the case to Commerce to reconsider its separate rate calculation which averaged the zero and AFA rates assigned to the mandatory respondents on the basis that Commerce "failed to consider evidence indicating that the 41.025{%} rate is not reasonably reflective of the separate rate respondents' dumping."  Bosun III, slip op. at 7 (citation and quotation omitted).  In remanding the case, the CIT explained that "Commerce 'misread Albemarle {Corp. v. United States, 821 F.3d 1345 (Fed. Cir. 2016)}' noting that Federal Circuit directed Commerce 'to consider any evidence on the record—in that case, the presence or absence of historical data—to determine whether to apply the expected method.'" PrimeSource 56.2 Br. at 36 (quoting Bosun Tools Co. v. United States, __ CIT __, __, 463 F. Supp. 3d 1309, 1318, n. 17 (2020)).  In later sustaining Commerce's remand redetermination finding that its separate calculation was reasonable based on the record, the CIT held that Commerce supported with substantial evidence its conclusion "that the 41.025% rate was reasonable given the general upward trend in antidumping rates over time."  Bosun III, slip op. at 8 (citing Bosun Tools Co. v. United States, __ CIT __, __, 493 F. Supp. 3d 1351, 1356-57 (2021)).

In upholding the CIT in Bosun III, the Federal Circuit examined the rates calculated for Bosun in past reviews and concluded that "the 41.025% rate was reflective of Bosun's historical dumping rates."  Id. at 12-14 (examining a rate chart of the rates calculated for Bosun in past reviews).  In short, the Federal Circuit affirmed, as argued by PrimeSource in its briefing before

this Court, that historical dumping rates can represent affirmative evidence that Commerce's use of the expected method to calculate the non-selected respondents' rate is not supported by substantial evidence where the inclusion of an AFA rate results in a calculated dumping margin that is not reasonably reflective of the non-selected respondents' potential dumping margins. See PrimeSource 56.2 Brief at 27-34; PrimeSource Reply Br. at 12-17.

Although the Federal Circuit upheld Commerce's use of the expected method as supported by substantial evidence where separate rates calculated in past reviews trended upward, Bosun III, slip op. at 12, the facts in this case are ultimately distinguishable from Bosun III. Here, Commerce's non-selected respondents' rate based on AFA was not reasonable because there is no increasing trend in the past rates calculated for Liang Chyuan Industrial Co., Ltd. ("LC") that supports the dramatic increase from the 2.54% dumping margin calculated for LC as a mandatory respondent in the third administrative review on one day to the 78.17% dumping margin assigned to LC as a non-selected respondent in the fourth review for entries the very next day and later. See PrimeSource 56.2 Br. at 28, n.4; see also PrimeSource Reply Br. at 15-17. Thus, Bosun III is ultimately distinguishable on the facts.

Respectfully submitted,

<u>Dated</u>: January 14, 2022

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Jill A. Cramer
Bryan P. Cenko
*Counsel to PrimeSource*
*Building Products, Inc.*

# ATTACHMENT

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

————————————

**BOSUN TOOLS CO., LTD., DANYANG NYCL TOOLS MANUFACTURING CO., LTD., DANYANG WEIWANG TOOLS MANUFACTURING CO., LTD., GUILIN TEBON SUPERHARD MATERIAL CO., LTD., HANGZHOU DEER KING INDUSTRIAL AND TRADING CO., LTD., JIANGSU YOUHE TOOL MANUFACTURER CO., LTD., QUANZHOU ZHONGZHI DIAMOND TOOL CO., LTD., RIZHAO HEIN SAW CO., LTD., ZHEJIANG WANLI TOOLS GROUP CO., LTD.,**
*Plaintiffs-Appellants*

**CHENGDU HUIFENG NEW MATERIAL TECHNOLOGY CO., LTD.,**
*Plaintiff*

**v.**

**UNITED STATES, DIAMOND SAWBLADES MANUFACTURERS' COALITION,**
*Defendants-Appellees*

————————————

2021-1929, 2021-1930

————————————

Appeals from the United States Court of International Trade in No. 1:18-cv-00102-CRK, Judge Claire R. Kelly.

————————————

BOSUN TOOLS CO., LTD. v. US

Decided:  January 10, 2022

_____

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, argued for plaintiff-appellant Bosun Tools Co., Ltd.  Also represented by JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

LIZBETH ROBIN LEVINSON, Fox Rothschild LLP, for plaintiffs-appellants Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Jiangsu Youhe Tool Manufacturer Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd., Zhejiang Wanli Tools Group Co., Ltd.  Also represented by BRITTNEY RENEE POWELL, RONALD MARK WISLA.

JOHN JACOB TODOR, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON, FRANKLIN E. WHITE, JR.; PAUL KEITH, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

STEPHANIE MANAKER BELL, Wiley Rein LLP, Washington, DC, argued for defendant-appellee Diamond Sawblades Manufacturers' Coalition.   Also represented by DANIEL B. PICKARD, MAUREEN E. THORSON.

_____

Before LOURIE, HUGHES, and CUNNINGHAM, *Circuit Judges*.

LOURIE, *Circuit Judge*.

Bosun Tools Co., Ltd. et al.[1] (collectively "Bosun") appeal from the final judgment of the United States Court of International Trade ("the Trade Court"). *Bosun Tools Co. v. United States*, 493 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ("*Decision*"). The court sustained the United States Department of Commerce's ("Commerce") calculation of a 41.025% antidumping duty rate. J.A. 176–98 ("*Second Remand*"). Because substantial evidence supports the 41.025% rate, we *affirm*.

## Background

Bosun is an exporter of diamond sawblades from China. Diamond sawblades are "circular cutting tools with a diamond-impregnated cutting surface, or blade, used primarily to cut materials such as cement, marble, brick, tile, and stone." *Diamond Sawblades Mfrs. Coal. v. United States*, 612 F.3d 1348, 1350 (Fed. Cir. 2010).

Commerce investigated Bosun and determined that it was selling its product in the United States at a price lower than its fair value (referred to as "dumping"). *See* 19 U.S.C. § 1677(34). As a result, it issued an order imposing an antidumping duty. *Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea: Antidumping Duty Orders*, 74 Fed. Reg 57,145 (Nov. 4, 2009). Commerce reviewed that order annually in order to reassess the antidumping duty. *See* 19 U.S.C. § 1675(a).

---

[1]    The following companies joined Bosun's opening brief, requesting the same relief as Bosun: Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Jiangsu Youhe Tool Manufacturers Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd., and Zhejiang Wanli Tools Group Co., Ltd. *See* Appellants' Notice of Joinder (July 6, 2021), ECF No. 21.

This appeal concerns Commerce's seventh administrative review of that order. Defendant-appellee Diamond Sawblades Manufacturers' Coalition (DSMC) was the domestic petitioner. *See* Appellee Gov't Resp. Br. 10.

We begin with a brief overview regarding how Commerce determines antidumping duty rates.

## I.

When Commerce determines that an exporter is dumping, it is authorized to impose an antidumping duty. 19 U.S.C. § 1673. An antidumping duty equals the amount by which the normal value of the subject merchandise exceeds its export price. §§ 1673e(a)(1), 1677(35). Commerce refers to that excess amount as the "dumping margin." *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372 (Fed. Cir. 2013) ("*Bestpak*").

Generally, Commerce must determine an individual dumping margin for each known exporter. 19 U.S.C. § 1677f–1(c)(1). However, when it is "not practicable" for Commerce to determine individual margins for each exporter, it may limit its examination to a "reasonable number of exporters" that either constitute (1) a statistically representative sample of all known exporters or (2) account for the largest volume of the subject merchandise from the exporting country. § 1677f–1(c)(2). Commerce refers to those selected for individual investigation as "mandatory respondents." *Bestpak*, 716 F.3d at 1372.

Commerce utilizes a different methodology when calculating antidumping rates in proceedings involving nonmarket economy ("NME") countries, such as China. In such cases, Commerce presumes that the exporters are under foreign government control and assigns them a single countrywide rate. *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016) ("*Albemarle*"); 19 C.F.R. § 351.107(d). The countrywide rate is often based on adverse facts available ("AFA"), which

Commerce applies when a company does not act to the best of its ability in complying with information requests. 19 U.S.C. § 1677e(b); *Bestpak*, 716 F.3d at 1373. Commerce's presumption of government control is rebuttable; an exporter that shows independence from government control may apply for a different rate. *Albemarle*, 821 F.3d at 1348.

After Commerce determines the rates for the mandatory respondents, it then assigns a separate rate to the non-individually examined respondents (i.e., the "separate rate respondents"). It calculates that separate rate by averaging the rates of the mandatory respondents, *excluding* rates that are de minimis, zero, or based entirely on AFA.[2] § 1673d(c)(5)(A). However, if the mandatory respondents are all assigned de minimis, zero, or AFA rates, the exception in § 1673d(c)(5)(B) applies. In that scenario, Commerce may calculate the separate rate by averaging the de minimis, zero, or AFA rates. More specifically, § 1673d(c)(5)(B) provides that:

> [Commerce] may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act, which Congress deems "authoritative," 19 U.S.C. § 3512(d), provides more guidance on that calculation, referred to as the

---

[2] To calculate the separate rate in NME proceedings, Commerce relies on the methodology in § 1673d(c)(5), which describes the calculation of the "all-others rate" assigned to non-mandatory respondents in market economy proceedings. *Decision*, 493 F. Supp. 3d at 1353 n.3.

"expected method." It states that "[t]he expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available." SAA accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201. However, if Commerce concludes that the expected method is "not feasible" or "results in an average that would not be reasonably reflective of potential dumping margins," then it "may use other reasonable methods." *Id.*

## II.

We now turn to Commerce's seventh administrative review of its antidumping duty order, covering November 1, 2015, through October 31, 2016. *See Initiation of Antidumping & Countervailing Duty Admin. Reviews*, 82 Fed. Reg. 4,294 (Dep't Commerce Jan. 13, 2017). As relevant here, in the previous administrative reviews, Bosun's antidumping rates were all above de minimis. *Second Remand*, at J.A. 190.

When conducting the seventh administrative review, Commerce determined that it would not individually review every company. J.A. 84. Rather, it selected as mandatory respondents the two companies accounting for the largest volume of exports: the Jiangsu Fengtai Single Entity ("Fengtai") and Chengdu Huifeng New Material Co., Ltd. ("Chengdu"). J.A. 89.

Commerce assigned the first exporter, Fengtai, an AFA China-wide rate of 82.05%.[3] *See Diamond Sawblades and Parts Thereof from China*, 83 Fed. Reg. 17,527 (Dep't of Commerce Apr. 20, 2018); J.A. 123–128. However, it

---

[3] Fengtai rebutted the presumption of government control. However, because it was uncooperative, Commerce assigned Fengtai an AFA rate that equaled the China-wide rate from a prior proceeding. J.A. 127–28.

assigned the second exporter, Chengdu, a 0% rate (following an appeal and a remand).  J.A. 114–18, 128; *Bosun Tools Co., Ltd. v. United States*, 405 F. Supp. 3d 1359 (Ct. Int'l Trade 2019); J.A. 140–59 ("*First Remand*").

Commerce then calculated the rate for the remaining companies, including Bosun.  Bosun asserted that it was free from government control and thus should receive a separate rate rather than the AFA China-wide rate.  Commerce agreed.  J.A. 96–97, 128, 149.  Accordingly, it calculated a separate rate for Bosun.  Because the only two antidumping rates in the review were AFA or 0%, Commerce calculated the separate rate pursuant to the exception in § 1673d(c)(5)(B).  Specifically, it averaged the two mandatory respondents' rates: (1) Chengdu's 0% rate and (2) Fengtai's AFA China-wide rate of 82.05%.  *First Remand*, at J.A. 149, 155.  The resulting separate rate for Bosun was 41.025%.  *Id.*  Commerce also assigned the 41.025% rate to the remaining separate-rate respondents. *Id.*

Bosun appealed to the Trade Court.  That court remanded the case to Commerce.  It held that Commerce "failed to consider evidence indicating that the 41.025[%] rate is not reasonably reflective of the separate rate respondents' dumping."  *Bosun Tools Co. v. United States*, 463 F. Supp. 3d 1309, 1318 (Ct. Int'l Trade 2020).  That evidence included antidumping rates from prior reviews. *Id.* at 1318–19.

On remand, in accordance with the Trade Court's order, Commerce considered the evidence concerning prior antidumping rates.  In light of that evidence, it concluded that the 41.025% rate was reasonable.  Specifically, it explained that the 41.025% rate was consistent with a general trend of increasing rates.  *Second Remand*, at J.A. 185–86.

Bosun appealed again.  This time, the Trade Court affirmed.  Like Commerce, the court determined that the

41.025% rate was reasonable given the general upward trend in antidumping rates over time. *Decision*, 493 F. Supp. 3d at 1356–57.

Bosun appealed to this court. The other separate-rate respondents joined Bosun's brief on appeal. *See* Appellants' Notice of Joinder (July 6, 2021), ECF No. 21. Because both Bosun and the separate-rate respondents make the same arguments, we address them together. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

This court reviews decisions of the Trade Court concerning Commerce's antidumping determinations by applying the same standard of review used by the Trade Court. *See Bestpak*, 716 F.3d at 1377. At the same time, "'we give great weight to the informed opinion' of that court, which has expertise in international trade matters." *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1018 (Fed. Cir. 2017) (quoting *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1162 (Fed. Cir. 2017)). Commerce's determination will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619–20 (1966)).

Bosun raises three challenges on appeal. Specifically, Bosun argues that Commerce's calculation of a 41.025% rate was not reasonably reflective of its potential dumping rate because it was (1) based on an AFA rate, (2) based on data that are not contemporaneous with the period of

review, and (3) inconsistent with historical dumping rates. We address each argument in turn.

## I.

Bosun first asserts that Commerce's 41.025% rate was unreasonable because it was based in part on Fengtai's AFA rate of 82.05%. According to Bosun, because it cooperated throughout the review, Commerce should not have assigned it a separate rate based on AFA. The government responds that Commerce was authorized by statute to rely on the AFA rate.[4]

We agree with the government. Bosun's argument is expressly foreclosed by statute. As explained above, § 1673d(c)(5)(B) provides that Commerce may factor an AFA rate into its calculation of a separate rate. The SAA reinforces the statute. It provides that relying on an AFA rate is not only permitted, but expected. *See* SAA at 4201.

Bosun also fails to address our approval of the methodology in § 1673d(c)(5)(B). For example, in *Albemarle Corp. v. United States*, we stated that the methodology "makes sense in light of the general assumption underlying the statutory framework." 821 F.3d 1345, 1353 (Fed. Cir. 2016). Specifically, we explained that "[t]he very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Id.* We further emphasized that "Congress has unmistakably explained" its preference for such "methodology." *Id.* at 1354. And, although *Albemarle* concerned a case with de minimis rates rather than AFA rates, its reasoning is equally applicable here; the same statutory language in § 1673d(c)(5)(B)

---

[4]    Because DSMC and the government make substantially the same arguments, we treat them together.

that permits use of de minimis rates also permits use of AFA rates.

Notwithstanding the language of § 1673d(c)(5)(B), Bosun insists that, under this court's precedent in *Bestpak*, Commerce cannot rely on the AFA rate in calculating a separate rate for a cooperative exporter. *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013). We disagree with Bosun's reading of that case. *Bestpak* concerned an antidumping duty investigation. *Id.* at 1374. As here, Commerce calculated the separate rate by averaging the mandatory respondents' de minimis and AFA rates. One cooperating separate-rate respondent appealed. The Trade Court affirmed. On appeal to this court, we vacated the Trade Court's decision. *Id.* at 1381. We explained that the record was "so thin" that Commerce could not have reasonably "found evidence to support [its] determination." *Id.* at 1379. In so holding, we did not create a categorical rule against relying on an AFA rate. In fact, we expressly confirmed that Commerce's separate rate calculation *could* include an AFA rate. *See id.* at 1378 ("[Section] 1673d(c)(5)(B) and the SAA *explicitly* allow Commerce to factor both de minimis and *AFA rates* into the calculation methodology.") (emphases added). We simply found that Commerce's methodology was unreasonable "as applied," given the lack of data. *Id.* Here, in contrast, there was no such lack of data. As will be explained further below, Commerce confirmed the reasonableness of the separate rate in view of historical dumping trends.

Accordingly, Commerce did not err in factoring Fengtai's AFA rate of 82.05% into its calculation.

## II.

Bosun next asserts that Commerce's rate was unreasonable because it was based on data that are not contemporaneous with the relevant period of review. Specifically, Bosun contends that Commerce should not have relied on Fengtai's 82.05% rate because it was a rate derived from a

prior administrative review. *See Diamond Sawblades and Parts Thereof from the People's Republic of China*, 81 Fed. Reg. 2,843, 2,844 (Dep't of Commerce Jan. 19, 2016).

Bosun's argument is unpersuasive. Again, Bosun ignores that its argument is foreclosed by statute.

First, as explained above, Commerce may rely on an AFA rate when calculating the separate rate. § 1673d(c)(5)(B). Second, under § 1677e(b)(2)(C), when determining an AFA rate, Commerce may rely on information from prior administrative reviews. Taken together, the statutory framework allows Commerce, when calculating the separate rate, to rely on an AFA rate derived from a prior administrative review.

Additionally, Commerce did not rely on the 82.05% rate arbitrarily, as Bosun insinuates. Rather, Commerce factored in that rate after determining that Fengtai, the mandatory respondent, failed to cooperate in the seventh administrative review, at issue here. Accordingly, Commerce's analysis was proper.

## III.

Finally, Bosun asserts that Commerce's rate was unreasonable because it was inconsistent with historical dumping rates. According to Bosun, its rates have "generally been low" and the 41.025% rate was "contrary to [its] trend of dumping." Appellant's Opening Br. 5–6. Bosun further emphasizes that Commerce ascribed too much weight to the 39.66% rate in the fifth administrative review and too little weight to lower rates from other administrative reviews. Those include the 6.19% rate from the sixth administrative review and the 0% rate from the ninth administrative review. The government responds that the 39.66% rate was reasonable given the general upward trend in dumping rates over time. A table, shown below, summarizes the rates from those reviews.

12                                          BOSUN TOOLS CO., LTD. v. US

| Review | Bosun's rate | Separate Rate |
|---|---|---|
| *AR1 - Diamond Sawblades and Parts Thereof Final Results of the 2009-2010 Antidumping Duty Administrative Review*, 78 FR 11143 (February 15, 2013) | 9.55% (Mandatory Resp.) | 9.55% |
| *AR2 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 36166 (June 17, 2013) | 8.10% (SRA only) | 8.10% |
| *AR3 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 35723 (June 24, 2014) | 4.65% (Mandatory Resp.) | 4.83% |
| *AR4 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 32344 (June 8, 2015) | 3.45% (Mandatory Resp.) | 12.05% |
| *AR5 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 FR 38673 (June 14, 2016) | 39.66% (SRA only) | 39.66% |
| *AR6 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 26912 (June 12, 2017)[1] | 15.91% (Mandatory Resp.) on remand (6.19% original) | 15.91% on remand (6.19% original) |
| *AR7 - Diamond Sawblades and Parts Thereof From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 17527 (April 20, 2018) | Review Subject to this Appeal | |
| *AR8 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 64331 (December 14, 2018) | SRA only | no calculated rate; AFA only |
| *AR9 - Diamond Sawblades and Parts Thereof Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 71308 (November 9, 2020) | 0.00% (SRA only) | 0.00% |

Appellant's Rep. Br. 11–12.

We agree with the government. As is clear from the record, Commerce's 41.025% rate was supported by substantial evidence.

First, as Commerce explained, Bosun's individually calculated rates were all above de minimis. *Second Remand*, at J.A. 190. Similarly, the separate rates trended upward, from 4.83% in the third administrative review, to 12.05% in the fourth administrative review, to 39.66% in the fifth administrative review (which was also assigned to Bosun). *Second Remand*, at J.A. 185–86. And, as Commerce pointed out, the 39.66% rate was "almost the same" as the 41.025% rate. *Id.* at J.A. 186.

Second, Commerce appropriately weighed the 39.66% rate the most heavily. The 39.66% rate was significant because it was derived from the most recent review in which the "separate rate for non-selected respondents was based on calculated rates above de minimis." *Id.* at J.A. 185–86. Still, Bosun emphasizes that, because it was not a mandatory respondent in the fifth administrative review, the 39.66% rate was not representative of its dumping rates. Bosun's assertion is misplaced. Pursuant to 19 U.S.C. § 1677f–1(c)(2), mandatory respondents are assumed to be "representative of all exporters." *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) (quoting *Albemarle*, 821 F.3d at 1353). Indeed, "[t]he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others rate.'" *Id.* (quoting *Nat'l Knitwear & Sportswear Ass'n v. United States*, 779 F.Supp. 1364, 1373–74 (Ct. Int'l Trade 1991)). Because Bosun does not adequately explain why the 39.66% rate was nonrepresentative, its argument cannot be persuasive.

Third, Commerce did not ignore Bosun's earlier antidumping rates. Indeed, it expressly acknowledged the relatively lower rates from prior reviews. *Second Remand,* at J.A. 185, 197. However, it emphasized that the more contemporaneous 39.66% rate supported an upward trend. *Id.* at J.A. 192. And, even more importantly, several of the lower rates that Bosun points to on appeal were hardly relevant to Commerce's analysis. For example, the 6.19% rate from the sixth administrative review was no longer in effect when Commerce conducted its analysis; by that point, Commerce had adjusted it upward to 82.05% (following an appeal and remand). *See Second Remand*, at J.A. 185. Commerce later adjusted it again to 15.91%. *Diamond Sawblades Mfrs. Coalition v. United States, Ct. Int'l Tr.*, No. 17-167, July 13, 2021, ECF No. 74-1. Similarly, the 0% rate from the ninth administrative review was neither finalized nor on the administrative record during

14                                    BOSUN TOOLS CO., LTD. v. US

Commerce's review, which the Trade Court explained and
Bosun does not dispute. *Decision*, 493 F. Supp. 3d at 1357.

Finally, although Bosun argues that Commerce's
41.025% rate was unreasonable, its proposed alternative
rate—0%—was not realistic. *See* Appellant's Br. 24. In-
deed, Commerce rejected Bosun's request for a 0% rate.
Commerce emphasized that the 0% rate was inconsistent
with Bosun's individually calculated rates, which were all
above de minimis. *Second Remand*, at J.A. 186–90. More-
over, according to Commerce, assigning Bosun a 0% rate
would be contrary to its "practice of assigning one rate to
all non-selected separate rate respondents in one segment
of a proceeding." *Id.* at J.A. 191.

Accordingly, Commerce reasonably determined that
the 41.025% rate was reflective of Bosun's historical dump-
ing rates. Bosun's argument amounts to nothing more
than a request for us to reweigh the evidence. We decline
to do so on appeal. *See Trent Tube Div., Crucible Materials
Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed.
Cir. 1992).

In summary, we conclude that Commerce's calculation
of the 41.025% rate was supported by substantial evidence.

CONCLUSION

We have considered Bosun's remaining arguments but
find them unpersuasive. For the foregoing reasons, we *af-
firm* the decision of the Trade Court.

**AFFIRMED**